In the Matter of a Member of the Bar of the Supreme Court of Delaware.

Michael R. DAVIS, Respondent.

No. 76, 2012.

Supreme Court of Delaware.

Submitted: March 7, 2012.
Decided: April 10, 2012.

Frederick W. Iobst, Chief Disciplinary Counsel, Joelle E. Polesky, Esquire, Office of Disciplinary Counsel, Wilmington, Delaware.

Charles Slanina, Esquire, Finger & Slanina, LLC, Hockessin, Delaware, for Michael R. Davis.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

PER CURIAM:

This is an attorney disciplinary proceeding involving charges of professional misconduct filed against the Respondent, Michael R. Davis ("Davis"). On October 7, 2011, a panel of the Board on Professional Responsibility (the "Board") issued a report ("Violation Report") [1] that concluded Davis violated the Delaware Lawyers' Rules of Professional Conduct (the "Rules") and the Delaware Lawyers' Rules of Disciplinary Procedure ("Disciplinary Rules"). The Board conducted a sanctions hearing on November 15, 2011. On February 15, 2012, the Board issued its recommendation that Davis be disbarred ("Sanction Report"). [2] Neither the Office of Disciplinary Counsel (the "ODC") nor Davis has filed any objections to the Board's recommended sanction of disbarment.

We have made an independent determination that the sanction recommended in the Board's Sanction Report is appropriate. Accordingly, we have decided that Davis must be disbarred.

### Petition for Discipline

On May 27, 2009, this Court entered an order suspending Davis from engaging in the practice of law as a member of the Delaware Bar for a period of one year based on misconduct involving "false notarizations, failure to safeguard fiduciary funds, failure to pay taxes, and misrepresentations" ("Suspension Order"). [3] At the end of the suspension, Davis submitted a Reinstatement Questionnaire to the ODC. In the course of investigating the Reinstatement Questionnaire, the ODC determined that some of Davis' answers on the Reinstatement Questionnaire were incomplete and misleading. Further investigation by the ODC led it to conclude that Davis had violated Rules 1.3,[4] 3.4(c),[5] 5.5(a),[6] 8.1(a),[7] 8.4(a),[8] 8.4(b),[9] 8.4(c),[10] 8.4(d) [11] and Disciplinary Rule 7(c) [12] in the time before and during his suspension, and

1. Appendix I.

2. Appendix II.

3. *In re Davis*, No. 301, 2008 (Del. May 27, 2009).

4. Rule 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

5. Rule 3.4(c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists."

6. Rule 5.5(a) provides that "[a] lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so."

7. Rule 8.1(a) provides that a lawyer in connection with a disciplinary matter shall not "knowingly make a false statement of material fact."

8. Rule 8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct. . . ."

9. Rule 8.4(b) provides that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Comment 2 to Rule 8.4 states, in part: "A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation."

10. Rule 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

11. Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice."

12. Disciplinary Rule 7(c) provides that it shall be grounds for disciplinary action for a lawyer to "[v]iolate the terms of any conditional diversion or private or public disciplinary or disability disposition."

thereafter, when he sought reinstatement. Therefore, the ODC filed a new Petition for Discipline on January 5, 2011 ("Petition") that resulted in this proceeding.

The current Petition is based on four alleged acts: First, that Davis violated the terms of the Suspension Order by engaging in the unauthorized practice of law by maintaining that part of his law office that performed title and settlement services, continuing to meet with clients or prospective clients, and continuing to speak at real estate seminars (Counts I–V); second, that prior to the Suspension Order, Davis violated the Rules by conducting a real estate settlement while under the influence of alcohol (Counts VI–VIII); third, that Davis violated the Rules by misleading police in connection with a traffic accident and then failing accurately to report the circumstances of that traffic violation in his Reinstatement Questionnaire (Counts XI–XV); and fourth, that Davis engaged in sanctionable conduct by disrobing in a public place while under the influence of alcohol and assisting his son in changing out of a bathing suit, and then failing to be fully candid about that incident in his Reinstatement Questionnaire (Counts XVI–XVIII).

The Petition charged Davis with eighteen counts of ethical violations. The ODC withdrew two counts. In its Violation Report, the Board found that Davis committed twelve ethical violations.

### Reinstatement Investigation

In the course of reviewing Davis' Reinstatement Questionnaire, the ODC discovered two prior acts of misconduct, both of which involved Davis' consumption of alcohol. The first incident involved a single-vehicle accident that occurred on September 18, 2008. Davis did not accurately report the circumstances surrounding this accident in his Reinstatement Questionnaire. The second incident involved a November 5, 2008 real estate settlement. The Board also found that during the suspension period, Davis knowingly disobeyed the Suspension Order and engaged in conduct that reflected adversely on his fitness as a lawyer.

*September 18, 2008*
*Single–Vehicle Accident*
*Rules 8.1(a); 8.4(b), (c), (d)*

■ In the late evening on September 18, 2008, Davis was involved in a single-vehicle accident. The Board found clear and convincing evidence that Davis consumed alcohol prior to the accident. Following the accident, Davis went directly home and continued to drink alcohol. When a New Castle County police officer arrived at Davis' home to investigate the accident, Davis answered the door with a glass of wine in his hand. Davis told the officer that "he had a few alcoholic drinks when he got home to calm his nerves." The lead investigator noted in the police report that he suspected the accident was alcohol-related based on his initial observation of the vehicle. However, the officer did not administer a blood alcohol test because he "would not have been able to determine if [Davis'] blood alcohol level was high because he drank when he was home or was it high because he was intoxicated while he was driving." The ODC presented the testimony of two witnesses who testified that Davis admitted to consuming alcohol before the accident and to drinking wine at home in order to circumvent the police investigation.[13]

---

13. The Board credited the testimony of two witnesses, Daniel Logan and Donna Marshall. The Board summarized their testimony as follows:

Logan testified that the day after the accident, Respondent called him to say that the lawyer in him came out and he popped open a couple of bottles of wine while waiting for the police to arrive so that the police

The Board concluded that Davis' conduct in connection with the motor vehicle accident was a violation of Rules 8.4(b), (c) and (d). The Board found that Davis violated Rule 8.4(b) by reporting false information (i.e. that he did not drink prior to the accident) to a law enforcement officer relating to an actual offense or incident in violation of title 11; section 1245 of the Delaware Code. The Board found that Davis ingested alcohol after the incident with the intent to circumvent the police investigation, and that this conduct involved dishonesty, deceit and misrepresentation in violation of Rule 8.4(c) and was prejudicial to the administration of justice in violation of Rule 8.4(d).

■ The Board also found that Davis violated Rule 8.1(a) when he knowingly made a false statement of material fact concerning the motor vehicle accident in his Reinstatement Questionnaire. After answering "yes" to the question whether Davis had ever been "cited, charged, warned, arrested or prosecuted for any crime or rules violation, including any motor vehicle accident or moving violation," Davis was required to provide additional information about the offense. Davis provided a narrative that included the following statements:

- "At the time of the accident I did not have my cell phone with me, so I walked home."
- "Originally, I was charged with Unsafe Speed and Failure to Report the Accident, however, upon an explanation of the fact that I did not have a means of communication (i.e. cell phone) with me at the time of the accident and a full explanation of the accident, the charge was reduced to inattentive driving."

- "Upon arriving home, I was greeted by the New Castle County Police."
- "I provided full cooperation with their [the police] investigation of the crash."
- "I provided full cooperation to the officers."

The Board found that the above narrative by Davis on the Reinstatement Questionnaire contained knowingly false statements of material fact in violation of Rule 8.1(a). With respect to the statement, "At the time of the accident I did not have my cell phone with me, so I walked home," the Board found it was false because the police report indicates that Davis informed the investigating officer that he was distracted by talking on the cell phone. The Board also found that the statements, "Upon arriving home, I was greeted by the New Castle County Police" and "I provided full cooperation with their [the police] investigation of the crash" were false based on the "clear and convincing evidence that Davis improperly frustrated a police investigation by drinking alcohol after the accident and before the police arrived." [14]

*November 5, 2008*
*Real Estate Settlement*
*Rules 1.3 and 8.4(d)*

■ The second act of unethical conduct that was discovered during the ODC's investigation of Davis' Reinstatement Questionnaire involved a November 5, 2008 real estate settlement, which Davis admitted conducting while under the influence of alcohol—but denied being impaired. The Board heard testimony from Debra Seramone, one of the owners of the entity Davis represented at the settlement. Ms.

would not be able to conclude that he had consumed too much alcohol before the accident. Donna Marshall testified similarly, adding that he told her he had gotten out of trouble for DUI by drinking before the po-

lice arrived at his home and that the police told him that that was a smart strategy. Violation Report at 44–45, Appendix I.

**14.** Violation Report at 44, Appendix I.

Seramone testified that Davis' behavior was "kind of unconventional and very uncomfortable. Michael just kind of talked and talked and talked about nothing, kind of babbled a little bit, didn't seem himself at all." She also testified that "[h]is face was flushed," and his speech "was slurred." At the conclusion of the settlement, Davis approached one of Ms. Seramone's partners and "said something to the effect of either 'I love you' or 'love you,' and moved forward to kiss her." Ms. Seramone testified that the next day, Davis called her to apologize for his inappropriate behavior and admitted to having had a drink at lunch before the afternoon settlement.

In connection with the November 2008 real estate settlement, the Board found that Davis failed to act with reasonable diligence in violation of Rule 1.3, and that he failed to treat "all persons involved in the legal process with courtesy and respect."[15] The Board also found that Davis' conduct was prejudicial to the administration of justice in violation of Rule 8.4(d).

### Disobeying Suspension Order Rules 3.4(c), 5.5(a), 8.4(a), 8.4(d) and Disciplinary Rule 7(c)

■ The Board found that Davis knowingly disobeyed the May 27, 2009 Suspension Order in violation of Rule 3.4(c) by: (1) meeting with a former client to provide legal advice; (2) discussing legal services and fees with a potential client which led her to believe that his residential services company could provide legal services; and (3) using his former law firm email address in communications with the public at least six weeks after the Suspension Order. The Board found that this conduct also violated Rules 5.5(a), 8.4(a), 8.4(d), and Disciplinary Rule 7(c).

### Lums Pond Incident Rule 8.4(b)

■ Approximately two months after this Court entered the Suspension Order, Davis was involved in his third alcohol-related offense within a ten-month period. Davis and his seven-year-old son spent an afternoon at Lums Pond. While there, Davis consumed alcohol. At the end of the afternoon, because Davis' son objected to changing from his bathing suit into dry clothing in the public bathroom, Davis and his son changed in the parking lot. While Davis and his son were changing, a couple and a child walking through the parking lot observed Davis naked from the waist down. One of the witnesses argued with Davis about the impropriety of Davis exposing himself in public.

An enforcement officer from the Department of Natural Resources and Environment Control, Division of Parks and Recreation was called to the scene. After conducting interviews of Davis and the witnesses, the officer issued a Complaint and Summons charging Davis with a conduct violation for indecent exposure and an alcohol violation for having a blood alcohol level of .16, twice the legal limit. Davis pleaded guilty to the charges.

Davis reported this incident in his Restatement Questionnaire and attached a copy of the Complaint and Summons. The Board noted that this incident was Davis' third alcohol-related violation in a ten-month period, which resulted in one ethical and two criminal violations. The Board concluded that "[t]his pattern of alcohol-related violations in a short time leads [it] to find that this incident, when added to [the other violations]," reflects "adversely on [Davis'] fitness as a lawyer in violation of Rule 8.4(b)."[16]

---

15. Rule 1.3 cmt. 1.

16. Violation Report at 49, Appendix I.

## Violation Report Affirmed

■■ The standard of proof required for the Board to find a violation of the Delaware Lawyers' Rules of Professional Conduct is by clear and convincing evidence.[17] Our scope of review of the Board's factual findings is limited to a determination of whether the record contains substantial evidence supporting the findings.[18] Our standard of review of the Board's conclusions of law is *de novo.*[19] If the record reflects substantial evidence to support the Board's factual findings, and the Board has made no error of law, its decision will be affirmed on appeal.

We have carefully and completely reviewed the findings of fact and conclusions of law in the Board's Violation Report. The record reflects clear and convincing evidence to support the Board's factual findings that Davis violated his ethical responsibilities. Accordingly, we affirm both the findings of fact and conclusions of law reached by the Board on the basis of and for the reasons stated in its Violation Report.[20]

## Sanction Recommendation

Following a hearing, the Board issued its Sanction Report recommending that Davis be disbarred. The Board found that three specific acts "cumulatively warrant[ed] the most serious sanction of disbarment."[21] First, after noting that the underlying conduct that led to Davis' suspension involved acts of deception, the Board found that by making false statements in the Restatement Questionnaire concerning the automobile accident, Davis engaged in at least one further act of misrepresentation and deceit. Second, the Board noted that Davis' conduct in connection with the automobile accident involved acts of misrepresentation and deceit. Third, the Board noted that Davis knowingly violated the Suspension Order by meeting on one occasion with a client to provide legal advice. The Board also concluded that disbarment is supported by the additional ethical violation in connection with the real estate settlement prior to the suspension and the two criminal violations in connection with the Lums Pond incident.

## Attorney Discipline

■ This Court has the exclusive authority for admitting and disciplining persons with regard to the practice of law in Delaware.[22] The nature of the relationship between this Court and an attorney was summarized by Victor B. Woolley in his seminal treatise on Delaware Practice:

The chief characteristic of an attorney-at-law is that he is an officer of the court.... He is an officer of the court, admitted as such by its order, upon evidence of his possessing sufficient legal learning and fair private character. The order of admission is the judgment of the court that he possesses the requisite qualifications as an attorney, and is entitled to appear as such and conduct causes therein.

... It is a right of which he can be deprived only by the judgment of the court, for moral or professional delinquency.[23]

17. Del. Lawyers' Rules of Disciplinary Procedure R. 15(c). *See also In re Berl,* 540 A.2d 410, 413 (Del.1988).

18. *In re Lewis,* 528 A.2d 1192, 1193 (Del. 1987).

19. *In re Berl,* 540 A.2d at 413 (citing *Olney v. Cooch,* 425 A.2d 610, 613 (Del.1981)).

20. Appendix I.

21. Sanction Report at 9, Appendix II.

22. *In re Green,* 464 A.2d 881, 885 (Del.1983).

23. 1 Victor B. Woolley, *Woolley on Delaware Practice* § 96 (1906) (citing *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 378–79, 18 L.Ed. 366 (1866)).

Maintaining high standards of professional and personal conduct for persons admitted to the Bar of this Court is essential to ensure the proper administration of justice within the judicial branch of our government. In discharging that State Constitutional responsibility, this Court has an obligation to protect the public "from incompetent and dishonest lawyers, and to assure that those admitted to the Bar possess the requisite attributes of good moral character, learning and ability."[24]

Accordingly, admission to the Bar is not a right. It is dependent upon an applicant's ability to demonstrate three fundamental qualifications: good moral character, learning, and competence.[25] If an applicant does not meet these qualifications, admission to the Bar is denied. Following a person's admission to the Bar, if these standards are not maintained, the continued privilege of practicing law in Delaware is subject to being either limited, suspended, or revoked by this Court.

The qualification at issue in Davis' disciplinary proceeding is good moral character. This Court has held that "[g]ood moral character has many attributes, but none are more important than honesty and candor."[26] Honesty has been the fundamental qualification for admission to the legal profession since ancient times.[27]

## Use No Falsehood

All lawyers take an oath upon their admission to the bar. The oath is a solemn promise of competent and ethical conduct, which dates back to the beginnings of the legal profession.[28] It is a venerable "tradition in both form and substance."[29] Honesty was a central requirement in the attorney's oath that was used in the era of Justinian. During the sixth century, advocates were required to swear that:

> [T]hey will undertake with all their power and strength, to carry out for their clients what they consider to be *true and just,* doing everything with it is possible for them to do. However, they, with their knowledge and skill, shall not prosecute a lawsuit with a bad conscience when they know [beforehand] that the case entrusted to them is *dishonest* or utterly hopeless or composed of *false allegations.* But even if, while the suit is proceeding, it were to become known [to them] that it is of that sort [i.e., *dishonest*], let them withdraw from the case, utterly separating themselves from any such common cause.[30]

The Justinian oath describes the balance between the lawyer's duties to the client and the court that continues today, including the duties to pursue "just" objectives and to withdraw from "dishonest" causes. The Justinian oath probably reflects the advocate's oath in Roman times, since the Justinian Code included Roman law going back to the time of Hadrian, in the second century.[31]

24. *In re Green,* 464 A.2d at 885.

25. *Id.*

26. *Id.*

27. Carol Rice Andrews, *The Lawyer's Oath: Both Ancient & Modern,* 22 Geo. J. Legal Ethics 3, 4 (2009).

28. *Id.*

29. *Id.*

30. Joseph Storey, *Commentaries on the Law of Agency, as a Branch of Commercial and Maritime Jurisprudence, with Occasional Illustrations From the Civil and Foreign Law* 26, n. 1 (Boston, Little & Brown 1832) (emphasis added) (quoting Justinian Code) (translated from Latin in Story's text).

31. *See* O.F. Robinson et al., *European Legal History* ¶¶ 1.2.1–1.2.2 (3rd ed.2000) (summarizing the Justinian Code).

In 1402, an Act of Parliament provided for the admission of attorneys in England by the courts upon examination, an official oath, and regulation of the conduct of attorneys.[32] The 1402 Act stated that attorneys shall be "sworn well and truly to serve in their offices."[33] According to Professor James E. Moliterno, the 1402 Act required an attorney to take an oath to be "good and virtuous, and of good fame."[34] While the 1402 Act did not specify any form, the attorney's oath adopted in furtherance of the 1402 Act, over 600 years ago, was the following pledge to "do no falsehood:"

> You shall doe noe Falsehood nor consent to anie to be done in the Office of Pleas of this Courte wherein you are admitted an Attorney. And if you shall knowe of anie to be done you shall give Knowledge thereof to the Lord Chiefe Baron or other his Brethren that it may be reformed you shall Delay noe Man for Lucre Gaine or Malice; you shall increase noe Fee but you shall be contented with the old Fee accustomed. And further you shall use yourselfe in the Office of Attorney in the said office of Pleas in this Courte according to your best Learninge and Discrecion. So helpe you God.[35]

Some variation of the "do no falsehood" oath[36] continued to be the attorney's oath in England until 1729, when "An Act for the Better Regulation of Attorneys and Solicitors" replaced the older oath with a new, simple oath. In the new oath, English attorneys and solicitors swore: "that I will truly and honestly demean myself in the practice of an attorney, according to the best of my knowledge and ability."[37] Although the exact term "do no falsehood" was removed from the attorney and solicitor oath in England, the ancient duty to be truthful is clearly perpetuated in the synonymous replacement term to "honestly demean myself in the practice of an attorney."

Even after the 1729 change in England, however, the "do no falsehood" oath was the principal form of oath used for attorneys in the American colonies. Its general use continued throughout the United States in the nineteenth century. Today, lawyers in the United States swear to one of three basic forms of oath—the English simple oath, the English "do no falsehood" oath, or the Swiss (ABA) detailed oath.[38] Honesty is a common principle that remains a constant in the attorney oath for every state regardless of the format.

Delaware and a number of other states continue to use a version of the venerable "do no falsehood" oath. Delaware first adopted the "do no falsehood" oath in

**32.** Josiah Henry Benton, *The Lawyer's Official Oath and Office* 27 (1909).

**33.** *Id.*

**34.** James E. Moliterno, *Lawyer Creeds and Moral Seismography*, 32 Wake Forest L.Rev. 781, 785–86 n. 37 (1997).

**35.** Josiah Henry Benton, *The Lawyer's Official Oath and Office* 28 (1909).

**36.** *See The Book of Oaths and the Several Forms Thereof, both Ancient and Modern Faithfully collected out of Sundry Authentic Books and Records not heretofore Extant, Compiled in one Volume* 29–30 (1649).

**37.** *An Act for the Better Regulation of Attorneys and Solicitors*, 2 Geo. 2, ch. 23, §§ 13, 14 (1729). The Act stated that this new form of oath was to be used "instead of the oath heretofore usually taken by the attorneys of such courts respectively." *Id. See also* James E. Moliterno, *Lawyer Creeds and Moral Seismography*, 32 Wake Forest L.Rev. 781, 786 n. 38 (1997).

**38.** Carol Rice Andrews, *The Lawyer's Oath: Both Ancient & Modern*, 22 Geo. J. Legal Ethics 3, 6, 45–49 (2009).

1704.[39] In 1721, Delaware shortened its variation of the "do no falsehood" oath, and three centuries later, that is essentially the form of oath used today.[40] Thus, Davis, took the following oath upon his admission to the Delaware Bar in 1998:

"I ..., do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of the State of Delaware; that I will behave myself in the office of an Attorney within the Courts according to the best of my learning and ability and with *all good fidelity as well to the Court as to the client; that I will use no falsehood* nor delay any person's cause through lucre or malice." [41]

### Oath and Discipline

For centuries, the attorney oath served as the primary statement of the ethical standards for the legal profession and also as the basis for attorney discipline. In an 1835 disciplinary proceeding, the Supreme Court of Pennsylvania recognized a broad range of options for sanctioning lawyers, including "expulsion from the bar," reprimand, and fines.[42] The Court emphasized the importance of caution in assessing the extreme punishment of expulsion.[43] Nevertheless, it concluded that expulsion was the appropriate penalty for an attorney's violation of his or her oath:

It is not doubted that any breach of the official oath is a valid cause, for proceeding for the former [expulsion]; for the man who deliberately violates the sanctions of a lawful oath, proves himself to be unworthy of further confidence; society has no other hold upon him. The most insignificant breach of the fidelity enjoined may, therefore, be visited with this measure.[44]

In reaching that conclusion, the court emphasized that "the end to be attained by removal, is not punishment, but protection." [45]

In 1908, the American Bar Association ("ABA") adopted national model standards of conduct for lawyers. Although the oath was part of those efforts, the ABA's 1908 project began promulgating "black letter" model rules of ethical conduct with more detailed guidance than was provided for in the oath alone. The ABA's recommended ethical standards for lawyers are currently set forth in the Model Rules of Professional Conduct.

The Delaware Lawyers' Rules of Professional Conduct, based on the ABA's Model Rules, provide detailed ethical guidance for Delaware lawyers, including the duty of honesty. The Board found that Davis violated, *inter alia*, Rule 8.1(a), Rule 8.4(b) and Rule 8.4(d): Rule 8.1(a) provides that, in connection with a disciplinary matter, a lawyer shall not "knowingly make a false statement of material fact." Rule 8.4(b) provides that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice."

 Notwithstanding this Court's adoption of the Delaware Lawyers' Rules of

**39.** Josiah Henry Benton, *The Lawyer's Official Oath and Office* 44 (1909).

**40.** *See id. See also In re Abbott*, 925 A.2d 482, 487 (Del.2007) ("[Delaware's] oath is, in its essential language, the same one taken by Delaware lawyers since colonial days.").

**41.** Del.Supr. Ct. R. 54 (emphasis added).

**42.** *In re Austin*, 1835 WL 2736, at *12 (Pa. Mar. 31, 1835).

**43.** *Id.*

**44.** *Id.*

**45.** *Id.*

Professional Conduct, the oath remains the primary statement of core ethical values for Delaware lawyers. Two fundamental ethical principles in the Delaware oath are to act with fidelity to the Court and to use no falsehood. The record reflects that Davis violated these fundamental ethical principles before and during his suspension, and thereafter, when he sought reinstatement.

### Disbarment Appropriate Sanction

■ This Court has reviewed the Board's Sanction Report. When deciding upon the appropriate sanction, this Court must consider that "[t]he primary purpose of disciplinary proceedings is 'to protect the public; to foster public confidence in the Bar; to preserve the integrity of the profession; and to deter other lawyers from similar misconduct.' "[46] The lawyer discipline system was not designed to be either punitive or penal in nature.[47]

■ We have carefully considered the ethical violations, the nature of the violations, the aggravating and mitigating factors, and all of the facts and circumstances of this case. We are in complete agreement with the analysis of our prior disciplinary decisions in the Board's Sanction Report.[48] We have independently determined that the sanction of disbarment recommended by the Board is appropriate.

This Court entered its Suspension Order because of ethical violations by Davis involving false notarizations and misrepresentations for personal gain. In that Suspension Order, we characterized Davis' misconduct as knowing and deceptive, "if not criminal." When Davis filed for reinstatement, he was required to demonstrate his rehabilitation.[49] Instead, the Board found that Davis' answers on the Reinstatement Questionnaire reflected misrepresentation and deceit. Further investigation of Davis' answers on the Reinstatement Questionnaire by the ODC revealed additional ethical violations by Davis before and during the time of this Court's Suspension Order. In addition, the Board found that Davis violated the Suspension Order.

As Woolley observed, when this Court enters an order of admission to the Delaware Supreme Court Bar, it is a judgment of this Court that the admittee possesses the requisite qualifications,[50] including good moral character. We can no longer make that judgment of Davis. He was suspended for knowingly violating this Court's ethical rules through deceit and misrepresentation. Davis then defied this Court by violating our Suspension Order and compounded that misconduct when he made misrepresentations to an arm of this Court in his Reinstatement Questionnaire.

■ The record reflects Davis no longer possesses the good moral character that is the *sine qua non* to be a member of the Bar of the Delaware Supreme Court, an officer of this Court. If Davis is not honest with this Court, we have no trust or confidence that he will be honest with other courts, his clients, or third parties.[51]

**46.** *In re Figliola*, 652 A.2d 1071, 1076 (Del. 1995) (quoting *In re Agostini*, 632 A.2d 80, 81 (Del.1993)).

**47.** *In re Rich*, 559 A.2d 1251, 1257 (Del. 1989).

**48.** *See, e.g., In re Tonwe*, 929 A.2d 774 (Del. 2007) and *In re Clyne*, 581 A.2d 1118 (Del. 1990).

**49.** Del. Lawyers' Rules of Disciplinary Procedure R. 22(a).

**50.** 1 Victor B. Woolley, *Woolley on Delaware Practice* § 96 (1906).

**51.** *See In re Clyne*, 581 A.2d 1118, 1127 (Del. 1990).

"When there can be no reliance upon the word or oath of a party, he is, manifestly, disqualified, and, when such a fact satisfactorily appears the court[s] not only have the power, but it is their duty to strike the party from the rol[l] of attorneys." [52]

### Conclusion

We conclude that any sanction other than disbarment would not provide the necessary protection for the public, serve as a deterrent to the legal profession, or preserve the public's trust and confidence in the integrity of the disciplinary process for Delaware lawyers. It is ordered that Michael R. Davis be disbarred from membership in the Bar of the Delaware Supreme Court. His name shall be stricken from the Roll of Attorneys entitled to practice law before the courts of this State.

### APPENDIX I

### BOARD ON PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF THE STATE OF DELAWARE

In the Matter of a Member of the Bar of the Supreme Court of Delaware:

**MICHAEL R. DAVIS,** Respondent.

ODC File No. 2010–0404–B,

Pending before the Board on Professional Responsibility is a Petition for Discipline filed on January 5, 2011 ("Petition") by the Office of Disciplinary Counsel ("ODC"). The Petition alleges that Michael R. Davis, Esq. ("Davis" or "Respondent") engaged in professional misconduct in violation of Rules 1.1, 1.3, 3.4(c), 5.5(a), 8.1(a), 8.1(b) (two counts), 8.4(a), 8.4(b) (three counts), and 8.4(c) and 8.4(d) (five counts) of the Delaware Lawyers' Rules of Professional Misconduct ("Rules") and Rule 7 of the Delaware Lawyers' Rules of Disciplinary Procedure. Davis is a real estate attorney. On May 27, 2009 the Delaware Supreme Court suspended Davis from engaging in the practice of law as a member of the Delaware Bar for a period of one year based on misconduct involving real estate transactions in which he had an interest, directly or indirectly, and in which he acted as counsel and/or settlement agent. *In the Matter of Michael R. Davis,* No. 301, 2008 at 13 (Del. May 27, 2009) *(per curiam ).* The Court found that Davis's misconduct involved "false notarizations, failure to safeguard fiduciary funds, failure to pay taxes, and misrepresentation." *Id.* at 12. The Supreme Court Order suspending Davis ("Suspension Order") prohibited him from "engaging in the practice of law as a member of the Delaware Bar for a period of one year" and from sharing in "any legal fees arising from clients or cases referred by Davis during the period of suspension to any other attorney or from sharing in any legal fees earned for services by others during such period of suspension." *Id.* at 13.

On May 27, 2010, Davis through his counsel submitted responses to a Reinstatement Questionnaire to Petitioner. Ex. 3. The ODC investigated the Reinstatement Questionnaire and concluded that Respondent had violated the Rules both before and after his suspension and so alleged in its Petition. Respondent answered the Petition on January 25, 2011 ("Answer"). The parties presented evidence on whether Davis had violated the Suspension Order on February 23–24, 2011. Post-hearing briefing concluded on June 9, 2011. For medical and logistical reasons the Supreme Court extended to October 7, 2011 the date for the Panel's

---

**52.** *Id.* at 1126 (quoting *In re Sullivan,* 530 A.2d 1115, 1118 (Del.1987)) (alterations in original).

decision on whether Davis had violated any ethical duties.

The Panel begins by setting forth the claims alleged and summary of recommendations, followed by the Panel's factual findings and the Panel's conclusions regarding each count.

## I. Claims Alleged

The ODC's claims arise out of four alleged acts: First, that Davis violated the terms of the Suspension Order by engaging in the unauthorized practice of law by maintaining that part of his law office that performed title and settlement services, continuing to meet with clients or prospective clients, and continuing to speak at real estate seminars (Counts I–V); second, that prior to the Suspension Order, Davis violated the Rules by conducting a real estate settlement while under the influence of alcohol (Counts VI–VIII); third, that Davis violated the Rules by misleading police in connection with a traffic accident and then failing accurately to report the circumstances of that traffic violation in his Reinstatement Questionnaire (Counts XI–XV); and fourth, that Davis engaged in sanctionable conduct by disrobing in a public place while under the influence of alcohol and assisting his son in changing out of a bathing suit and then failing to be fully candid about that incident in his Reinstatement Questionnaire (Counts XVI–XVIII). The ODC voluntarily dismissed Counts IX and X and withdrew from the record all facts and evidence relating to those counts at the outset of the hearing.

### Summary of Panel Recommendations

For the reasons stated, the Panel recommends that the Supreme Court find as follows regarding each count of the Petition:

## COUNT I: RESPONDENT KNOWINGLY DISOBEYED THE MAY 27, 2009 SUSPENSION ORDER IN VIOLATION OF RULE 3.4(c):

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent knowingly disobeyed the May 27, 2009 Suspension Order in violation of Rule 3.4(c) by meeting with one former client, Herb Gillespie, to provide legal advice, by discussing possible legal services and quoting a fee for document preparation to a potential client, Nancy Wolf, a legal service subsequently provided by attorney Nixon, and by failing to completely eliminate email communications under the name Davis Law more than six weeks after the issuance of the Suspension Order.

The Panel also finds that the ODC failed to prove by clear and convincing evidence that Respondent provided legal advice to clients in his management of a real estate settlement services business at the offices of his former law firm or in his speaking at seminars for realtors and lenders and therefore did not prove that Respondent engaged by those actions in the unauthorized practice of law or knowingly violated the Suspension Order.

## COUNT II: RESPONDENT PRACTICED LAW IN VIOLATION OF THE REGULATION OF THE LEGAL PROFESSION IN DELAWARE IN VIOLATION OF RULE 5.5(a):

Rule 5.5(a) requires that a lawyer "not practice law in a jurisdiction in violation of the legal profession in that jurisdiction." For the reasons stated in discussing Count I, the Panel finds that Respondent violated Rule 5.5(a) when he met with and provided legal advice to Mr. Gillespie.

**COUNT III: RESPONDENT ENGAGED IN PROFESSIONAL MISCONDUCT BY VIOLATING OR ATTEMPTING TO VIOLATE THE RULES OF PROFESSIONAL CONDUCT IN VIOLATION OF RULE 8.4(a):**

Rule 8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct." For the reasons stated in our analysis of Count I, the Panel finds that the ODC proved by clear and convincing evidence that Respondent violated Rule 8.4(a).

**COUNT IV: RESPONDENT ENGAGED IN PROFESSIONAL MISCONDUCT BY ENGAGING IN CONDUCT THAT IS PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE:**

Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." For the reasons stated in our analysis of Count I, the Panel finds that the ODC proved by clear and convincing evidence that Respondent violated Rule 8.4(d).

**COUNT V: RESPONDENT VIOLATED THE TERMS OF HIS PUBLIC DISCIPLINE IN VIOLATION OF RULE 7(c) OF THE DELAWARE LAWYERS' RULES OF DISCIPLINARY PROCEDURE:**

Rule 7(c) of the Delaware Lawyers' Rules of Disciplinary Procedure provides that it shall be grounds for disciplinary action for a lawyer to "[v]iolate the terms of any [public] disciplinary [disposition]." For the reasons stated in the Panel's discussion of Count I, the Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated the terms of his public discipline.

**COUNT VI: RESPONDENT FAILED TO PROVIDE COMPETENT REPRESENTATION TO A CLIENT IN VIOLATION OF RULE 1.1:**

The Panel finds that Petitioner failed to prove by clear and convincing evidence that Respondent violated Rule 1.1 in connection with the November 5, 2008 real estate settlement.

**COUNT VII: RESPONDENT FAILED TO ACT WITH REASONABLE DILIGENCE IN VIOLATION OF RULE 1.3:**

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 1.3 in connection with the November 5, 2008 real estate settlement.

**COUNT VIII: RESPONDENT ENGAGED IN CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE IN VIOLATION OF RULE 8.4(d):**

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(d) in connection with the November 5, 2008 real estate settlement.

**COUNTS IX and X Withdrawn from Record by ODC at Start of Hearing**

**COUNT XI: RESPONDENT COMMITTED A CRIMINAL ACT IN VIOLATION OF RULE 8.4(b):**

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(b) by reporting false information to a law enforcement officer relating to an actual offense or incident in violation of 11 *Del. C.* § 1245.

**COUNT XII: RESPONDENT ENGAGED IN CONDUCT INVOLVING DISHONESTY, DECEIT AND MISREPRESENTATION IN VIOLATION OF RULE 8.4(c):**

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(c) by ingesting alcohol following a motor vehicle accident with the intent to prevent the police from performing an alcohol test to determine whether Respondent had been driving under the influence.

**COUNT XIII: RESPONDENT ENGAGED IN CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE IN VIOLATION OF RULE 8.4(d):**

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(d) by ingesting alcohol following a motor vehicle accident with the intent to prevent the police from performing an alcohol test to determine whether Respondent had been driving under the influence.

**COUNT XIV: RESPONDENT KNOWINGLY MADE A FALSE STATEMENT OF MATERIAL FACT IN VIOLATION OF RULE 8.1(a):**

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.1(a) in his narrative describing his conduct in the September 18, 2008 motor vehicle accident.

**COUNT XV: RESPONDENT FAILED TO DISCLOSE A FACT NECESSARY TO CORRECT A MISAPPREHENSION KNOWN TO HAVE ARISEN IN VIOLATION OF RULE 8.1(b)**

Rule 8.1(b) provides that a lawyer in connection with a disciplinary matter shall not "fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter." The Panel finds that the ODC has not proved a violation of this Rule.

**COUNT XVI: RESPONDENT ENGAGED IN A CRIMINAL ACT IN VIOLATION OF RULE 8.4(b):**

The Panel finds that Petitioner has proven by clear and convincing evidence a third alcohol-related offense in ten months that resulted in one ethical and two criminal violations. While none of these individually would suffice to constitute a violation of Rule 8.4(b), the Panel finds that Respondent's use of alcohol resulted in conduct that reflects indifference to legal obligation in a concentrated time period.

**COUNT XVII: RESPONDENT ENGAGED IN CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE IN VIOLATION OF RULE 8.4(d):**

The Panel finds that Petitioner has not proved by clear and convincing evidence that Respondent violated Rule 8.4(d) in connection with the July 19, 2009 Lums Ponds incident.

**COUNT XVIII: RESPONDENT FAILED TO DISCLOSE A FACT NECESSARY TO CORRECT A MISAPPREHENSION KNOWN TO HAVE ARISEN IN VIOLATION OF RULE 8.1(b):**

The Panel finds that Petitioner failed to prove by clear and convincing evidence a violation of Rule 8.1(b) in connection with the Lums Pond incident.

*FINDINGS OF FACT*

*Mr. Davis's Practice Prior to his Suspension*

1. At the time of his suspension, Mr. Davis was the managing and sole attorney in Davis Law, LLC ("Davis Law"), a real estate law practice.[1]

---

1. Tr. 34: 2–9; Tr. 38: 15–24; Tr. 39:1–3.

2. Davis Law's clients generally were home-buyers or homeowners doing refinancings referred to Davis Law primarily from builders, real estate agents and lenders.[2]

3. Davis sometimes fielded telephone calls at Davis Law directly from parties seeking legal advice.

4. Davis was a title agent for Fidelity National Title, a title insurance company.[3]

5. Davis Law earned fees from handling real estate closings for home-buyers or homeowners, from a portion of the title insurance fee and for certain ancillary services such as preparation of mortgage satisfactions.[4]

6. To market Davis Law, Davis often spoke at seminars for realtors and lenders,[5] including as an accredited instructor with the Delaware Real Estate Commission.[6]

7. Davis also made presentations as the closing attorney to first-time home buyers to assist them in receiving preferred financing though the Delaware State Housing Authority or New Castle bond program.[7]

8. Davis at Davis Law employed and supervised paralegals to prepare documents for closings handled by Davis. This work by paralegals included ordering title searches and surveys, preparing title commitments, preparing settlement statements and preparing packages for closing and post-closing.[8]

9. Davis Law sometimes helped smaller law firms by charging a fixed fee to process their files when the smaller firm's paralegal was on vacation.[9]

### Davis Actions Following Suspension on May 27, 2009

10. On May 27, 2009 at 9:40 p.m., Davis sent an email to an attorney who offered to cover a seminar for him in light of Davis's suspension. Davis replied that Davis's firm had the seminar covered and that "FYI—we are operating business as usual." [10]

11. On May 28, 2009 at 8:19 a.m. Davis's counsel advised that he should be careful in this kind of response because "it suggests that you intend to defy the Court Order." David replied at 8:20 a.m. "o.k. but I have to be able to get my message out." [11]

12. Based on Davis's counsel's advice not to tell those who inquired that it was business as usual, Davis's staff stopped using that phrase.[12]

13. The Supreme Court appointed a receiver, Andrew Taylor, Esq., to

---

**2.** Tr. 34:5–9; Ex. 23, Deposition transcript of Jennifer Ellis ("Ellis Dep.") at 10:2–4.

**3.** Tr. 497:19–24.

**4.** Tr. 39: 4–14.

**5.** Tr. 45:3–13.

**6.** Tr. 40:1–13; Tr. 553:18 –554:8 (Davis estimating that he did up to 50 first-time home-buyer seminars per year and up to 20 continuing education classes per year).

**7.** Tr. 40:14–41:14.

**8.** Ex. 23, Ellis Dep. at 6:11–10:1.

**9.** Tr. 547: 15–548:18.

**10.** Ex. 4 at 85.

**11.** Ex. 4 at 85.

**12.** Ex. 23 at 25:13–26:1(Ellis Dep.)

take over Davis Law following Respondent's suspension. Taylor employed Tyler Nixon, Esq. as a contract attorney.[13]

14. Davis cooperated with the receiver by among other things, turning over all the bank accounts of Davis Law and meeting with him to provide information necessary for Taylor to complete closings that had been scheduled for clients of Davis Law prior to the suspension.

15. Davis ceased to be a title agent after his suspension.[14]

16. Davis ceased doing first-time homebuyer seminars after his suspension.[15]

17. On June 29, 2009, Mr. Davis formed Redwood Settlement Services, LLC d/b/a Redwood Real Estate Services ("Redwood").[16] Redwood is owned 50% by Davis and 50% by Gary Bryde, Esq.[17]

18. Redwood is a real estate title and settlement services company that occupied the same offices, with a lease in the name of Davis Law, used the same phone number and the same staff, and relied on the same referral sources as Davis Law.[18]

19. Non-lawyers in Delaware own and operate similar companies.[19]

20. Respondent removed signage at the Davis law office, removed letterhead and business cards identifying Davis Law following Respondent's suspension[20] and Bryde never used signage, business cards or letterhead with the name Davis while he performed closings for clients referred by Redwood.[21]

21. Davis's responsibility at Redwood was to manage the staff including the paralegals on a day to day basis and to market Redwood to real estate agents, attorneys and lenders. In those roles he was unsupervised by an attorney.

22. If the staff at Redwood had questions about documents being prepared for closings, including questions about issues concerning title or a survey or encroachments, the staff at Redwood would discuss those issues with Davis.[22]

23. Bryde testified that it was his responsibility to review and approve all documents prepared by Redwood for a closing, including reviewing and approving the title search and the surveys.[23]

**13.** Tr. 72:15–20.

**14.** Tr. 497:19—498:3.

**15.** Tr. 481:2–22.

**16.** Ex. 2 Davis Answer to Petition ¶ 8.

**17.** Tr. 35:19–22.

**18.** Ex. 2 Davis Answer to Petition ¶ 9; Tr. 71:2—72:1; Tr. 512: 23–24 & 513:1–7 (Redwood employing same paralegals and staff as Davis Law);Tr. 34: 2–24 & 35–39; Ex. 23, Ellis Dep. at 10 (clients for Davis Law came from "[r]eferral sources from lenders and real estate agents"); Tr. 137: 11–14 (Davis Law's business was "referred by realtors, loan officers, past clients," as it "was a referral business").

**19.** Tr. 452:15—453:16 (Conaty);Tr. 498:7—499:14 (Lusky).

**20.** Tr. 537:17–22.

**21.** Tr. 335: 7–336:3.

**22.** Ex. 23 Ellis Dep. 14: 24–15:11.

**23.** Tr. 340:16–341:3.

24. Apart from closings performed by the Receiver, and certain other attorneys immediately following Respondent's suspension, Bryde or attorneys under his direction generally performed closings for clients for whom Redwood prepared settlement packages.

25. Bryde employed Nixon after the formation of Redwood.[24]

26. Davis neither performed nor attended nor interacted with clients at closings and earned no legal fees from real estate closings or otherwise following his suspension; legal fees were earned entirely by Bryde.

27. Redwood received 80% of the title premium and those funds were used to pay the paralegals and office rent and expenses of Redwood.[25]

28. Although Davis testified that following his suspension he removed his email signature indicating "Davis Law"[26], on July 13, 2009 he sent an email to Nixon signed "Davis Law" directing Nixon to refrain from providing direction to Redwood's paralegals.[27]

29. As late at July 26, 2009, Donna Marshall, an employee of Davis Law and then Redwood, sent an email to a referral source on which she copied Davis which identified her email address as "donna@davislawworks.com."[28]

### Seminars

30. Davis presented six seminars after his suspension to realtors and lenders.[29] The titles of the seminars he presented are: "Managing Closing Delays & Loan Underwriting," "Real Estate Transaction Closing Procedures in Maryland," "Understanding the New Good Faith Estimate or "GFE" and HUD–1 Settlement Statement," which he presented on two occasions, "Understanding the New Good Faith Estimate or "GFE" and HUD–1 Settlement Statement and Computing Title Insurance Premiums," and "Title Agent Concerns in Back to Back Short Sale Transactions".[30] Davis received no compensation for speaking at these engagements.[31] Davis's written materials identified him as "Michael R. Davis—Title Agent"[32], Davis stated at the outset that he was not an attorney[33], and Nixon was at the seminars to answer legal questions.[34]

### The November 8, 2008 Settlement

31. Davis admitted that on November 5, 2008 he conducted a settlement

24. Tr. 72:21–23.

25. Tr. 403:2–6.

26. Tr. 537: 22—538:4.

27. Ex. 4 at 102.

28. Ex. 4 at 103.

29. Tr. at 45: 3–13.

30. Ex. 3 at 76—78.

31. Tr. 51: 6–10.

32. Tr. 585:7–15

33. Tr. 483:10–18.

34. Tr. 583:10–584:8. ODC also contends that Davis gave a seminar on short sales shortly after his suspension in June 2009. That contention is based on the testimony of a disgruntled former Redwood employee, Donna Marshall. Ms. Marshall testified that she attended a seminar in June 2009 in Rehoboth regarding short sales (Tr. 17:10–11), although the organizer of the seminar provided testimony that this did not in fact occur. (Respondent Ex. 4—Affidavit of Nora Martin). Ms. Marshall also testified that Davis presented a seminar to potential legal clients who were first-time homebuyers the day following his suspension which Davis denied. In light of Ms. Marshall's having lost a claim she filed with the Department of Labor concerning her separation from Redwood and her admitted

while under the influence of alcohol but denied that he was impaired.[35]

32. At that settlement Mr. Davis represented JAMM Investments, LLC ("JAMM"), an entity owned by Debra Seramone ("Ms. Seramone") and her partners.[36] Ms. Seramone is a realtor who used Mr. Davis for closings for many years prior to his suspension.[37]

33. Ms. Seramone, who attended the closing with her three JAMM partners,[38] testified that Davis's behavior "was kind of unconventional and very uncomfortable. Michael just kind of talked and talked and talked about nothing, kind of babbled a little bit, didn't seem himself at all."[39] She further testified that Davis did "not seem himself"— "[h]is face was flushed. He talked about just nothing that had to do with settlement. Stupid jokes."[40] His speech "was slurred."[41] At the conclusion of the settlement, Davis approached one of Ms. Seramone's JAMM partners and "said something to the effect of either 'I love you' or 'love you,' and moved forward to kiss her."[42] Seramone's account of Davis's unusual behavior on the day of the closing is corroborated by the testimony of Ellis who testified that on that day Davis returned from lunch "inebriated and conducted a closing,"[43] that "he smelled of alcohol" and was talking about "something crazy."[44]

34. After the closing, either that evening or the next day, Davis called Seramone to apologize for his inappropriate behavior, and admitted having had a drink at lunch before the afternoon settlement.[45]

### The September 18, 2008 Accident

35. In the late evening on September 18, 2008, Davis was in a single vehicle accident.[46]

36. Davis consumed alcohol prior to the accident.[47] He also had a small

hostility to him, the Panel does not find that reliance on her testimony alone is clear and convincing evidence. The Panel finds similarly regarding two alleged homebuyer seminars where the sole evidence the ODC presented of Davis's alleged participation was the testimony of Nixon. That is because Nixon was (i) terminated by Bryde for having a secret law practice while under an exclusive employment agreement (prior to his own suspension from the practice of law), (ii) described by third parties as "angry" and "vengeful" toward both Davis and Bryde (Tr. 358:7–8 & 22–23) and (iii) on the record of having promised to do whatever he could to "cease the reinstatement." (Tr. 359:3–5.) Again, the Panel does not find Nixon's uncorroborated testimony clear and convincing evidence that Davis in fact spoke at two homebuyer seminars.

35. Ex. 2 at Paragraph 26.

36. Ex. 18; Tr. 368: 5–12.

37. Tr. 366:10–24.

38. Tr. 368:15–18.

39. Tr. 369:1–5.

40. Tr. 369:12–16.

41. Tr. 369: 22–23.

42. Tr. 370: 2–6.

43. Ex. 23 (Ellis Dep.) at 44.

44. *Id.* at 46.

45. Tr. 370: 22–24 & 371:1–9.

46. Ex. 2 at Paragraph 38.

47. *Id.*

glass of wine with him in the car which spilled when he crashed.[48]

37. Davis went directly home, and attempted to find a tow truck company to bring the car home but was unsuccessful.[49]

38. Davis contacted his "buddy," Daniel Logan ("Logan"), when he arrived home in an attempt to locate a tow truck.[50] Logan recalled Mr. Davis telling him he wanted a tow truck to get his vehicle "out before the police saw it."[51] Logan testified that when Davis called him, he sounded "a little panicked. Words were slurred."[52]

39. On the same evening as the crash occurred, two New Castle County officers investigated. One of the officers went to Davis's home to investigate. Davis testified that when the officer arrived at his residence, he answered the door with a glass of wine in his hand.[53] The officer testified that when Davis answered the door it appeared he had been drinking and the officer could smell alcohol on him.[54] Davis told the officer he had some drinks to "calm his nerves."[55] When the officer returned with Davis to the scene of the accident, Davis told the second officer, who was the lead investigator, that "he had a few alcoholic drinks when he got home to calm his nerves."[56]

40. The lead investigator wrote in his report that Davis informed him that he "was traveling [westbound] on Stone Block Row. He was rounding the curve, in the area of Brecks Lane. He advised he was driving to[o] fast, and was on the cell phone. As a result he lost control."[57]

41. Although the investigating officer reported that there was "visible" damage to an approximate 30–foot section of a wooden fence,[58] Davis stated he did not think it a reportable accident as he "didn't know there was any property damage at the time it occurred."[59]

42. The lead investigator noted on the police report that a "hand held cell phone" was a "driver distraction."[60] Davis denied that he informed the investigating officers that he was on the cell phone, and stated that he told them he did not have it with him.[61]

43. The lead investigator also noted on the police report "yes—alcohol suspected" based on his "initial observations of the vehicle."[62] Howev-

48. Tr. 94: 2–21; Tr. 556: 2–8.

49. Tr. 100:3–14; Ex. 21 at 175; Tr. 379:18–20.

50. Tr. 99: 17–21 & 100:3–6.

51. Tr. 408: 3–11.

52. Tr. 407: 23–408:1.

53. Tr. 96: 3–5.

54. Tr. 403: 5–22.

55. Tr. 403: 23–24 & 404:1–3.

56. Ex. 21 at 175; Tr. 100: 23–101:2; Tr. 379: 23–24.

57. Ex. 21; Tr. 379: 12–14.

58. Ex. 21; Tr. 385: 22—386:2.

59. Tr. 103:13–15; Tr. 566:13–14 ("I didn't know there was a fence there or see it").

60. Ex. 21 at 174.

61. Tr. 95: 17–96: 1 & 97:16–18.

62. Ex. 21; Tr. 381: 3–4.

er, the lead investigator did not administer a blood alcohol test because:

Based upon what he told me, in my mind, I would not have been able to determine if his blood alcohol level was high because he drank when he was home or was it high because he was intoxicated while he was driving. That was the reason I did not give it because it wouldn't have painted a clear picture of when in fact the alcohol was consumed.[63]

44. The lead investigating officer charged Davis with Unreasonable Speed and Failure to Report an Accident on a Public Highway with Property Damage of $500 or more.[64]

45. The lead investigator recalled asking Davis whether he drank before the accident and Davis "stated no".[65]

46. Although Mr. Davis "denies that he drank wine before the police arrived in order to circumvent the police investigation," [66] Logan testified that the day after the September 18 accident he again spoke with Davis, and he sounded "like another person. . . . A degree of arrogance. Jubilation. An entirely different person than the night before." [67] Davis told Logan, " 'I got home and *the lawyer in me came out,* and I popped open a couple bottles of wine.' " [68] Davis also informed Logan that he drank before

the accident and that was "the reason he popped open the bottles of wine." [69] Mr. Logan explained:

A: He was drinking. He didn't want to have someone come to their home . . . He didn't want someone to come to their home—to his home and find that he was drinking. So as a result, he popped open the wine so no one could say—he just had the wine while he was home.

Q: Mr. Davis told you that?

A: Yes. Absolutely. That's when he said to me *"The lawyer in me came out."* [70]

47. Marshall also recalls Davis informing her in the days following the accident that "he had been drinking and that he had lost control," after which he "ran back to his home . . . and opened two bottles of wine and drank them and waited for the police to arrive".[71] She further recalls that "[h]e was pretty proud of himself because he had gotten out of being charged with a DUI or any kind of real trouble. He did indicate at the time that the police seemed to know exactly what he was doing and they knew that their hands were tied." [72]

48. The Attorney General's office eventually dismissed the charges of failure to report and unsafe speed and Respondent pleaded guilty to inattentive driving as reflected in the guilty plea form he attached to his Reinstatement Questionnaire.

---

63. Tr. 382:13–20.

64. Ex. 21 at 177.

65. Tr. 387: 10–15; Tr. 388:11–12.

66. Ex. 2 ¶ 38.

67. Tr. 409:15–23.

68. Tr. 410:8–10 (emphasis added).

69. Tr. 411: 3–4.

70. Tr. 411: 6–16 (emphasis added).

71. Tr. 159: 6–13.

72. Tr. 160:5–10.

49. Davis's description in the Questionnaire of what occurred on September 18 includes the following:

- "At the time of the accident I did not have my cell phone with me, so I walked home."
- "Originally, I was charged with Unsafe Speed and Failure to Report the Accident, however, upon an explanation of the fact that I did not have a means of communication (i.e. cell phone) with me at the time of the accident and a full explanation of the accident, the charge was reduced to inattentive driving."
- "Upon arriving home, I was greeted by the New Castle County Police."
- "I provided full cooperation with their [the police] investigation of the crash."
- "I provided full cooperation to the officers." [73]

### The July 19, 2009 Lums Pond Incident

50. On July 19, 2009 Davis and his seven-year old son spent an afternoon at Lums Pond.

51. Davis consumed alcohol while at Lums Pond.

52. At the end of the afternoon Davis's son objected to changing from his bathing suit into dry clothing in the public bathroom.

53. Davis and his son changed in the parking lot.

54. While Davis and his son were changing, a couple and a child ("Witnesses") walking through the parking lot observed Davis naked from the waist down.

55. One of the Witnesses argued with Davis about the impropriety of Davis exposing his fiancee's daughter to Davis with his pants down.

56. A park patrol officer overheard the argument and radioed an enforcement officer from the Department of Natural Resources and Environmental Control ("DNREC"), Division of Parks and Recreation.

57. After separately interviewing Davis and each of the Witnesses, the DNREC enforcement officer issued Davis a Complaint and Summons. That document charged Davis with two violations titled "Conduct Violation" and "Alcohol Violation," respectively.[74] The Conduct Violation was for indecent exposure and the alcohol violation was for having a blood alcohol level of .16, twice the legal limit.[75]

58. Davis reported this incident on his Restatement Questionnaire as "Conduct Violation" and "Alcohol Violation" and attached a copy of the Complaint and Summons as an exhibit to the Restatement Questionnaire.[76] The Complaint and Summons submitted to the ODC reflects an "X" in the box next to "Voluntary Assessment" and is signed by Davis. The description of "Voluntary Assessment" reflects that checking this box indicates the undersigned's "desire to plead guilty to the stated charge(s)." [77]

**73.** Ex. 3 at 71.

**74.** Ex. 3 (last two pages).

**75.** Tr. 434:10—438:5; Ex. 22(DNREC officer's report).

**76.** Ex. 3 (last two pages).

**77.** *Id.*

### Legal Analysis/Burden and standard

As the ODC acknowledges, it bears the burden of proving the charged misconduct by clear and convincing evidence. *See* Rule 15(c) (standard of proof) and Rule 15(d) (burden of proof) of the Delaware Lawyers' Rules of Disciplinary Procedure ("Procedural Rules"). The Delaware Supreme Court has defined clear and convincing evidence to be that which "produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] 'highly probable.'" *Hudak v. Procek,* 806 A.2d 140, 147 (Del. 2002) (citations omitted). Stated differently, "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt." *Id.*

### Analysis of Counts I–V Related to Provision of Settlement Services, Speaking at Seminars and Communications with Clients or Prospective Clients

### COUNT I: RESPONDENT KNOWINGLY DISOBEYED THE MAY 27, 2009 SUSPENSION ORDER IN VIOLATION OF RULE 3.4(c):

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent knowingly disobeyed the May 27, 2009 Suspension Order in violation of Rule 3.4(c) by meeting with one former client, Herb Gillespie, to provide legal advice, by discussing possible legal services and quoting a fee for document preparation to a potential client, Nancy Wolf, a legal service subsequently provided by attorney Nixon, and by failing completely to eliminate email communications under the name Davis Law more than six weeks after the issuance of the Suspension Order.

The Panel also finds that the ODC failed to prove by clear and convincing evidence that Respondent provided legal advice to clients in his management of a real estate settlement services business at the offices of his former law firm or in his speaking at seminars for realtors and lenders and therefore did not prove that Respondent engaged in the unauthorized practice of law or knowingly violated the Suspension Order.

Rule 3.4(c) provides that "a lawyer shall not knowingly disobey an obligation under the rules of the tribunal, except for an open refusal based on an assertion that no valid obligation exists." As noted above, on May 27, 2009 the Delaware Supreme Court suspended Davis from engaging in the practice of law as a member of the Delaware Bar for a period of one year. *In the Matter of Michael R. Davis,* No. 301, 2008 at 13 (Del. May 27, 2009) (*per curiam*). The Supreme Court Order suspending Davis prohibited him from sharing in "any legal fees arising from clients or cases referred by Davis during the period of suspension to any other attorney or from sharing in any legal fees earned for services by others during such period of suspension." *Id.* Petitioner and Respondent agree that the Suspension Order required Davis to comply with it and the case law interpreting what a suspended attorney is permitted to do.

After careful consideration of the evidence and the case law, the Panel finds that the ODC proved by clear and convincing evidence that Davis knowingly violated the Suspension Order in three ways:

1. He provided legal advice to a client, Herb Gillespie.

2. He discussed possible legal services and quoted a fee for document preparation to a potential client, Nancy Wolf, a service subsequently performed by attorney Nixon.

3. He failed more than six weeks after the Suspension Order to remove the name of his former firm from email communications.

The ODC acknowledges that its claim against Davis raises an issue of first impression, namely, whether "a *suspended* attorney [can] operate a real estate title and settlement services company out of the same offices, with the same staff, and obtaining business from the same referral sources, as his real estate law practice prior to suspension?"[78] In stating the question this way Petitioner acknowledges that it did not seek to prove that Davis violated the Court's order by working as a real estate attorney for buyers or homeowners at any closing or by sharing in the fees from any such legal work or from the referral of any such legal work. The ODC submitted no evidence that any such legal work or attorneys fee-sharing by Davis occurred. The ODC argues instead that a suspended lawyer during the period of suspension may not manage a real estate title and settlement services company even if the work of that company is reviewed at closing by licensed attorneys who alone represent and interact with the clients and who receive all attorneys' fees. Davis counters that his creation of a company to provide support services for attorneys and not the public in connection with real estate settlements violates neither the Suspension Order nor the case law regarding what a suspended attorney is permitted to do.

The Panel finds that the ODC has failed to prove by clear and convincing evidence that in continuing to provide settlement services Respondent knowingly violated the Suspension Order. The Panel recognizes that had the Supreme Court specified the type of acts that it intended to bar in the Suspension Order, it might not have permitted Respondent without more direct attorney supervision to supervise in the same offices the same paralegals who at Davis Law had performed settlement ser-

vices and likewise might have barred him from speaking at real estate seminars to lenders and realtors as he had done while an attorney at Davis Law. Here, unlike in the non-Delaware cases relied upon by Petitioner, at the time of suspension, the Delaware Supreme Court had issued a well-reasoned decision, *In the Matter of Mid–Atlantic Settlement Services, Inc., et al.,* File no. UPL 95–15 (Del. May 31, 2000), that spelled out what aspects of the settlement process required attorney review. Further, the Court in a trilogy of cases addressing the limits on a suspended attorney who works as a paralegal in a law office had made clear that past or prospective client contact to provide or seek to provide legal advice was forbidden. The Panel notes that Davis made sure to avoid contact with any client at any closing, a prohibition that was clear in the trilogy of cases discussing what a suspended lawyer must avoid, and that all work the Supreme Court has held must be done by an attorney at a real estate closing was performed by attorneys other than Davis who shared none of their fees with Davis. The Panel finds that, apart from the three items noted above, the ODC failed to prove by clear and convincing evidence that Respondent's behavior in managing the settlement services company he formed post-suspension and in speaking at six seminars to lenders and realtors constituted the unauthorized practice of law or violated the Suspension Order. Under these circumstances the Panel notes that even the authority relied upon by the ODC reflects caution to find that a suspended attorney knowingly violated a Suspension Order when the relevant tribunal had never previously found the conduct at issue to violate any rule of professional conduct. *See In Re Mitchell,* 901 F.2d 1179, 1189 (3d Cir.1990) (declining to discipline suspended attorney who

---

**78.** ODC Opening Brief at 30.

handled appeal and licensed attorney who agreed to file papers for him as long as suspended attorney remained responsible for the legal work because the novelty of the question compelled court to limit ruling to actions taken after the date of its opinion). Therefore, while we find that the Supreme Court may find Davis's creation of a settlement services company and speaking at seminars to realtors and lenders to be beyond what a suspended real estate attorney should have done, we cannot recommend that the Court find that Davis *knowingly* violated the Suspension Order by engaging in these activities.

Before turning to the specific acts at issue, we begin by reviewing the applicable case law.

**Case Law Re Limits on Suspended Attorneys**

As the ODC correctly states, no Delaware case addresses the precise issue of whether a suspended attorney can manage a real estate services company to supply settlement packages to attorneys who conduct closings from the same office with the same staff and the same phone as his prior law practice. A trilogy of cases address what a suspended lawyer can and cannot do while working as a paralegal in a law office to which we now turn for guidance: *In re Sanders*, 1985 WL 5255 (Del.1985), *In Re Frabizzio*, 508 A.2d 468 (Del.1986) and *In Re Mekler*, 672 A.2d 23 (Del.1995).

In *Sanders*, the Supreme Court was asked to determine the circumstances under which a suspended attorney could serve as a paralegal in a law firm. The Court approved such employment but restricted the suspended attorney to:

1. Review and summarization of documents;

2. Legal research and drafting of intra-office memoranda and briefs;

3. Drafting of pleadings and other legal instruments, provided all such pleadings shall be reviewed, approved, and signed by a member or associate attorney of such firm;

4. Drafting of suggested correspondence as directed by and under the supervision of, the attorney primarily responsible for the case or matter in consideration;

5. Such similar duties which are customarily performed by paralegals under the supervision of attorneys *except* that there shall be no contact with clients, witnesses, or prospective witnesses. Furthermore, such duties, and those designated in the preceding paragraphs, shall in no event include advising or counseling clients or prospective clients of the firm in the client's legal relationships, rights, duties, or responsibilities, the legal consequences of any proposed action, or the application of law to any facts or circumstances of the client or prospective client.

6. The suspended attorney would be compensated on a salary basis and receive no share of any legal fee earned by the employer.

7. Respondent's employment with his employer shall not be mentioned in any professional announcement, office or building signs or directories, office letterhead, telephone listing or legal directory. Personal business cards, if used by respondent, will clearly designate his status as that of paralegal.

*Id.*

In *Frabizzio* the Delaware Supreme Court was asked to determine whether a lawyer suspended from the private practice of law could nonetheless work as a law clerk/paralegal in another attorney's private law practice with telephone and per-

sonal contact with clients, witnesses and prospective witnesses. The Court held that the suspended attorney could "perform the tasks usually performed by law clerks and paralegals ... except that he may not have direct contact as a law clerk or paralegal with clients, witnesses, or prospective witnesses." *Id.* at 469. The Court explained its rationale for this restriction by citing with approval the words of the Florida Supreme Court as follows:

> To the layman, the difference between mere clerking and the unrestrained practice of law is not readily apparent. He observes an attorney, supposedly under suspicion for unethical conduct, walking into law offices; necessarily he must wonder whether the attorney is indeed being disciplined. This confusion is compounded when the disciplined attorney is interviewing witnesses as an investigator on behalf of the law firm or otherwise discussing cases with clients. The resulting detriment to the integrity and reputation of the Bar is obvious ... I am also concerned that the attorney who is suspended or disbarred for unethical conduct, upon returning to a law office, will encounter difficulty in confining himself to strictly preparatory functions.

*Id.* at 469, *quoting The Florida Bar v. Thomson,* Fla.Supr., 310 S.2d 300, 303 (1975).

The Court also cited with approval the observation of the Supreme Court of North Dakota that:

> A suspended lawyer is not the same as a layman. The public knows that he has a legal education, that he has engaged in the practice of law, and that his words and opinions are presumably more valuable on that account. We cannot accept the argument that a ... suspended lawyer may engage in all activities which non-lawyers also perform.

*Id.* *quoting Application of Christianson,* N.D.Supr., 215 N.W.2d 920, 925 (1974).

Following *Frabizzio,* in *Mekler* the Supreme Court denied a suspended attorney the right to have "direct contact with clients or prospective clients or witnesses or prospective witnesses when acting as a paralegal or law clerk or under the supervision of a member of the Bar, or otherwise." *Mekler,* 672 A.2d at 26. The suspended attorney had sought to be able to have such contact while working as a paralegal under the supervision of an attorney with a Family Court practice. The suspended attorney had proposed that he be permitted such contact under appropriate safeguards including a written disclaimer to all clients in the fee agreement and elsewhere that the attorney was suspended and a commitment to offer no advice to clients or to convey the legal advice of opinions of the supervising attorney. *Id.* at 25. In denying this proposal the Court noted that

> Perception is often reality. It would be very difficult for the members of the public to be expected to understand Mekler's status if he were permitted such contacts.... It is the responsibility of this Court to protect members of the public in their dealings with those providing legal services and to prevent non-lawyers (including suspended lawyers) from the practice of law or the perceived practice of law. That responsibility would not be advanced if this Court were to accede to the Request. It must be clear to the public that this Court is effective in its discipline of members of the Bar, that its judgments will not be diluted and that it will not send mixed signals.

*Id.* at 25–26.

Of particular concern to the *Mekler* court was that Mekler had been suspended because of a failure to supervise his own

non-lawyer staff in their dealings with clients. *Id.* at 26. The Court was concerned that Mekler as a non-lawyer would exceed the boundaries that limit what non-lawyers can do. *Id.* Notwithstanding Mekler's protestations that he would not exceed his limitations as a non-lawyer, the Court stated that

> ... [T]his Court cannot countenance conduct by a suspended lawyer which would leave the impression to a reasonable person that the Court would allow the same kind of "business as usual" which it has already found to be impermissible in Mekler's own case, or that it is *de facto* permitting a suspended lawyer to be doing any act which a reasonable member of the public could believe to be the practice of law.

*Id.*

The Supreme Court also has addressed what constitutes the practice of law relating to real estate settlements. In *In the Matter of Mid–Atlantic Settlement Services, Inc., et al.,* File no. UPL 95–15 (Del. May 31, 2000), the Court concluded that a Delaware attorney is required to conduct a closing for the sale of Delaware real property or of a refinancing loan secured by Delaware real property. Specifically, the Court held that the following actions constitute the practice of law:

a. Determining the proper legal description of the property (as set forth on the deed) to be included on Exhibit A to the mortgage;

b. Explaining to the borrower(s) the terms of many legal documents, including the note, mortgage, Planned Unit Development Rider, the Truth–in–Lending Disclosure and the first payment letter.

*Id.* at 17. The Court held that

An attorney licensed to practice law in Delaware is required to be involved in a direct or supervisory capacity in drafting or reviewing all documents affecting transfer of title to Delaware real property or where Delaware real property is used as security for the repayment of a debt or the performance of an obligation, with the exception of home equity loans in which the lender is acting in a pro se capacity and no evaluation of exceptions to title is required.

.The participation of an attorney licensed to practice law in Delaware is necessary in evaluating the legal rights and obligations of the parties, representing the buyer in examining the title and removing exceptions to the title, supervising the disbursement of funds, and responding to questions concerning the legal effect of documents and ramifications of a transaction by which title to Delaware real property is used as security for the repayment of a debt or the performance of an obligation, with the exception of home equity loans in which the lender is acting in a pro se capacity and no evaluation of exceptions to title is required.

*Id.* at 24–25.

Petitioner also relies upon a Kansas decision rendered fifteen months after the Suspension Order in which the Kansas Supreme Court denied reinstatement to a suspended attorney who engaged an independent contractor to handle his legal practice while he was suspended, *In re Miller,* 290 Kan. 1075, 238 P.3d 227 (2010). The suspended attorney paid the independent contractor on an hourly basis and reported his compensation to the Internal Revenue Service as that of an independent contractor. No written agreement documented the relationship. The independent contractor worked out of the office of the suspended attorney. The suspended attorney made all financial decisions for the firm. The sole action taken by the suspended attorney to comply with the suspension order was to change the signature

page on letters and pleadings and to hire the independent contractor to review and sign letters and pleadings and make court appearances. *Id.* at 232. On at least one occasion a letter on the letterhead of the suspended lawyer was sent on behalf of a client to an opposing party in a legal matter. When the disciplinary counsel investigated, the suspended lawyer failed to provide the file in that matter as requested by disciplinary counsel.

The Kansas Supreme Court, in an opinion dated August 13, 2010, held that the suspended attorney had engaged in the unauthorized practice of law. The rationale for that conclusion was that "Rather than going to work for an attorney, the Respondent appears to have hired an attorney to continue his legal work for him. The supervision that is required by the rules was not present in this case." *Id.* at 232. The Kansas Supreme Court held that as neither the suspended attorney nor his professional corporation could contract for the professional corporation to provide legal services, the suspended attorney lacked the authority to hire an independent contractor to provide legal services for the clients of the professional corporation. *Id.* at 236.

Although none of these decisions addresses the facts present here, certain principles emerge. First, in the circumstance of a suspended attorney working in a law office under the supervision of a Delaware attorney, the Supreme Court has recognized that a suspended attorney may do work traditionally done by a paralegal or law clerk, including review and summarization of documents; legal research and drafting of intra-office memoranda and briefs; drafting of pleadings and other legal instruments, provided all such pleadings are reviewed, approved, and signed by a member or associate attorney of such firm; drafting of suggested correspondence as directed by and under the supervision of, the attorney primarily responsible for the case or matter in consideration; and such similar duties which are customarily performed by paralegals under the supervision of attorneys. Second, the Supreme Court consistently has held that there can be no contact with clients, witnesses, or prospective witnesses and no advising or counseling clients or prospective clients of the firm in the client's legal relationships, rights, duties, or responsibilities, the legal consequences of any proposed action, or the application of law to any facts or circumstances of the client or prospective client, even if the suspended attorney provides appropriate disclaimers. Third, in the context of a suspended lawyer working in a law firm or a law office, the Supreme Court has identified a major concern that members of the public not perceive that the suspended lawyer is nonetheless practicing law. That is why the Court did not accede to the suspended lawyer's request in *Mekler* to be allowed client contact while working as a paralegal in a law office—members of the public might believe that a suspended lawyer meeting with clients in a law office was in fact practicing law, notwithstanding the disclaimers and protections the suspended lawyer offered to provide. Finally, the *Kraus* case indicates that a suspended attorney may not continue to cause his professional corporation to do legal work and receive legal fees for clients through an independent contractor where there is insufficient evidence that the suspended attorney received appropriate supervision.

The parties agree that non-lawyers run and are permitted to run title and settlement service companies.[79] They also agree in part on the legal standard, i.e.,

**79.** Tr. 449:21—450:1 (Conaty); Tr. 498:24— 499:14 (Lusky).

that a suspended lawyer may not have direct contact with clients, witnesses or prospective clients or witnesses and may not engage in activities that a reasonable person may construe as the practice of law. *Mekler*, 672 A.2d at 25. The ODC contends that a suspended attorney may not meet with clients while suspended even if those meetings are unrelated to the provision of legal services while Davis contends that a suspended lawyer may meet with former law firm clients as long as he does not provide legal services and a reasonable former client does not reasonably believe that he is providing legal services. Neither party disagrees that the Supreme Court "cannot countenance any conduct by a suspended lawyer" leaving the impression "that it is *de facto* permitting a suspended lawyer to be doing any act which a reasonable member of the public could believe to be the practice of law." *Id.* at 26.

As a preliminary matter, the Panel rejects the argument of ODC that referral sources are legal clients. While it is true that referral sources for Davis—realtors and lenders—were the sources of his clients, his clients for his practice of law were the persons he represented prior to his suspension: homebuyers and homeowners. It is to those persons that he owed duties arising out of an attorney-client relationship. The ODC submits no authority for the *ipse dixit* that the Panel

should view the referral sources as clients of Davis Law for purposes of the proscription against his meeting with clients or prospective clients during his suspension.[80]

Second, the Panel does not find that the ODC met its burden to prove by clear and convincing evidence that Davis provided legal advice to realtors and lenders. ODC's claim that Davis provided legal advice to realtors and lenders is based upon the testimony of Marshall and Nixon. The Panel does not find general, uncorroborated testimony from Marshall or Nixon alone to be clear and convincing evidence that Davis in fact provided legal advice to realtors or lenders, given their bias and stated desire to do harm to Davis in the reinstatement process.[81] Also, Marshall could not identify by name a single realtor to whom Davis allegedly said that, although he was suspended, he could still provide legal advice.[82] Similarly, the only realtor Nixon identified as one to whom Davis allegedly provided legal advice was Stephen Marcus. Marcus testified that although he did call Davis to ask whether he could assist a client regarding a problem with a condo association Davis reminded him that he was suspended and referred the matter to Nixon.[83] Marcus further testified that Davis provided no legal advice and performed no legal services to him during Davis's suspension.[84] Both because of the lack of specificity and

**80.** Petitioner does argue that Davis had served as an agent of the sellers relying upon *Norton v. Poplos*, 443 A.2d 1, 6 (Del.1982) and *Alejandro and Reinholz v. Hornung*, 1992 WL 200608, at *1 (Del.Ch.1992). Together these cases stand for the proposition that a *realtor* is an agent of a seller. This does *not establish*, however, that Davis was an agent of the realtors or sellers or that the realtors or sellers were clients of Davis Law. ODC presented no evidence from any realtor or lender that it viewed Davis Law as its agent or counsel. Indeed, the evidence presented in connection with the transaction involving Wolf is that when Davis and later Bryde or Nixon per-

formed closings, they did so solely on behalf of the buyers. That a seller, or real estate agent or lender may have preferred Davis Law to handle a closing on behalf of a buyer, did not make the seller or those entities clients of Davis Law. If in fact they were, ODC submitted no such evidence.

**81.** *See* n. 34, *infra.*

**82.** Tr. 188:9–22.

**83.** Tr. 523:1–11.

**84.** *Id.* at 523:24–524:4.

corroboration of the testimony by Marshall and Nixon, the Panel does not find that the ODC proved by clear and convincing evidence that Davis provided legal advice to realtors or lenders during his suspension.[85]

Third, the Panel does not believe that the proscription on meeting with former clients during the period of suspension was intended to mean that Davis could not meet with them in settings where there was no expectation or any evidence of actual provision of legal services or legal advice. Thus, as explained below, the ODC adduced no evidence that Davis provided legal advice during his meetings with Nicholson, and therefore the Panel does not believe that Davis's meetings with Nicholson violate the Suspension Order.

The harder question is the one of first impression: may a suspended Delaware real estate attorney whose legal practice prior to suspension included providing settlement services continue to provide the settlement services out of the same offices as long as a different Delaware attorney handles all closings, the suspended attorney avoids contact with clients or prospective clients, the suspended attorney eliminates all communications with the public under the name of the former firm, and the suspended attorney receives no legal fees?

The *Christianson* case, cited approvingly by the Delaware Supreme Court in *Frabizzio*, well stated the issue:

> [T]o what extent, if any, may a suspended attorney engage in activities which, when performed by a licensed attorney, constitute a part of his practice of law, but which also may be performed lawfully by laymen.... On the one hand, it seems extremely harsh to rule that a suspended lawyer, who already has been subjected to the deprivation of his means of livelihood, should further be deprived of opportunities to earn a living by doing things which laymen are permitted to do, such as investigating accidents, preparing tax returns, filling out simple deed forms as a real estate broker and doing legal research as a law clerk to a licensed attorney. On the other hand, the petitioner appears to take the extreme position that he is permitted to do anything that a layman could do, and, as a law clerk, everything that an attorney could do except appear in court. To adopt this view would mean that a suspension of one's license to practice law would be a penalty lightly borne.

*Christianson*, 215 N.W.2d at 924. *See generally Nature of Legal Services or Law–Related Services Which May Be Performed for Others by Disbarred or Suspended Attorney*, 87 A.L.R.3d 279 (1978) (hereafter *"Nature of Legal Services"*).

Davis argues that as long as he complies with the exact terms of the Suspension Order and follows the guidance from the case law of no contact with clients or prospective clients, he should be free as a suspended attorney to engage in activities that non-lawyers otherwise routinely perform. Further, Davis does not consider it problematic that as a suspended attorney he supervises paralegals in the provision of the same settlement services from the same office at the same phone number from which he practiced law because he took appropriate steps to change the name and the signage and to ensure that he did

---

**85.** For similar reasons the Panel does not find that the ODC proved by clear and convincing evidence that while suspended Davis represented that he was an attorney in communications with lenders or collection agencies as the sole testimony to that effect came from Ms. Marshall.

not have contact with or provide advice to clients. Indeed, Davis concedes that for the settlement portion of his former practice, it was his intent to have the lenders and realtors know that it was business as usual.

The Delaware case law provides that a suspended attorney cannot engage in all activities that non-lawyers may do. Thus, even accepting that paralegals for family law practitioners meet with clients, the Supreme Court in *Mekler* held that a suspended attorney may not do that because there was too great a risk that the suspended attorney would give legal advice and the public might be confused. Similarly, although a non-lawyer can run an incorporation service, a suspended lawyer may not necessarily incorporate entities for clients. *Application of Christianson,* 215 N.W.2d at 923. At least one court has found that a suspended attorney can perform title abstracts where he expresses no opinion as to the quality of the title and provides his work to a supervising attorney in an office other than his or the supervising attorney's law office. *See In Re Stoldt,* 37 N.J. 364, 181 A.2d 364 (1962). The principle allowing certain activities by a suspended lawyer that may be performed by non-lawyers was stated in *Christianson* as follows:

> A suspended lawyer may engage in some such activities if he is otherwise qualified to do so, but not if his qualifications come from having been a lawyer. For example, a suspended lawyer who is also a public accountant may prepare tax returns as a public accountant. But a suspended lawyer may not prepare the papers necessary to incorporate a corporation merely because one of the stockholders of the corporation might also be able to fill in the blanks on a printed form by himself. When professional expertise enters into the activity, and when the activity is one which is customarily performed by lawyers, then such activity is forbidden to a suspended attorney, even though under some conditions members of other professions may sometimes be allowed to perform the same acts.

*Christianson,* 215 N.W.2d at 926 (emphasis supplied). *See also Nature of Legal Services* at 9[b].

The evidence at the hearing established that the provision of settlement services is not customarily done by lawyers alone but instead is often done by companies where no attorneys are involved. The ODC does not contend that work by those entities is the practice of law.[86] The Panel is not persuaded as a general matter that a suspended attorney who manages an office that provides settlement services violates a suspension order or engages in the unauthorized practice of law, as long as the suspended attorney follows scrupulously the terms of the suspension order and the existing case law regarding what a suspended lawyer can do.

The ODC argues that Davis explained at two seminars for realtors and lenders how a change in the law affected the HUD–1 forms and that that conduct exceeded the limit of what a suspended attorney is permitted to do. Davis does not dispute that he conducted two such seminars post-suspension but testified that his remarks were limited to explaining how the new four-page forms differed from the former two-page forms. The sole attendee who testified at the hearing, Helena Davidson, a realtor, testified that in her view Davis offered no legal advice to any person and that no homebuyers attended.[87]

---

**86.** Tr. at 19:18–20:9.

**87.** Tr. at 492.

The Panel finds that the ODC failed to prove by clear and convincing evidence that Respondent's speaking at seminars to realtors and lenders violated the Suspension Order. The ODC offered no evidence of what Respondent said at those seminars other than the testimony of Respondent which did not reflect the giving of legal advice. We note that Respondent avoided homebuyer seminars post-suspension which would have reflected improper communications to potential clients. The Panel finds that the ODC failed to prove by clear and convincing evidence that Respondent presented at such homebuyer seminars post-suspension.

*Allegations of Improper Client Contacts*

The ODC alleges that Davis met with three clients following his suspension to provide legal advice: Herb Gillespie, Donald Nicholson, and Nancy Wolf. The ODC called Nicholson and Wolf to testify; the ODC did not call Gillespie to testify.

*Gillespie*

The ODC contends that Davis met with Herb Gillespie, a client prior to Davis's suspension, on the morning of a hearing in the JP Court on a litigation matter. Davis had filed the litigation prior to his suspension on behalf of an entity in which Gillespie was a principal, PHS, Inc. Nixon testified that he met with Davis the night before the hearing to go over the case. At a meeting the next morning among Davis, Gillespie and Nixon, Nixon testified that Davis provided "the entire strategy as to how the litigation would be, the case would

be conducted, [what] were the relevant points to bring out." [88] Davis testified he had no recollection of such a meeting.[89]

The Panel is troubled that ODC did not call Mr. Gillespie to corroborate the testimony of Nixon. Nonetheless, in carefully assessing the demeanor of the witnesses, including the specificity and clarity of Nixon's recollection [90] and the weakness of Davis's explanation that he recalled no such meeting,[91] the Panel finds that the ODC met its burden by clear and convincing evidence that Respondent met with Gillespie and Nixon on the morning of his hearing and provided legal advice and that this conduct violated the Suspension Order.

*Nicholson*

Nicholson is a financial advisor and a principal in Nicholson & Associates.[92] Before Davis's suspension, Nicholson hired Davis for closings and refinancing on both his primary residence and his personal investment properties.[93] One of the closings Davis handled before his suspension was for a property Nicholson purchased with Gillespie.[94] After Davis's suspension, Nicholson hired Redwood to provide the settlement packages for refinancings.[95]

Davis met with Nicholson on two occasions after his suspension.[96] At those post-suspension meetings Nicholson and Davis discussed, among other issues, "general economic conditions" in the real estate market.[97] The Panel finds that Nicholson's testimony of having met twice with Davis and discussed general conditions in

---

88. Tr. 270: 23 –271: 2.

89. Tr. 571:24—572:12.

90. This contrasts with other testimony of Nixon which the Panel did not find credible.

91. Tr. 572:2–12.

92. Tr. 295:21—296:8.

93. Tr. 297: 15–24—298: 3.

94. Tr. 300: 21—301:15.

95. Tr. 298: 14 –18; Tr. 302: 4–9.

96. Tr. 303: 5–11; Tr. 304:12–14.

97. Tr. 304: 7–11 & 305: 5–13

the real estate market hardly constitutes the practice of law. The ODC does not even argue that Davis gave any legal advice to Nicholson. It argues instead that the phrase "or otherwise" from the *Mekler* decision reiterating the proscription against meeting with clients means that a suspended lawyer cannot meet with a former client at all during the lawyer's suspension, regardless of the context. The language at issue is the sentence from *Mekler* that the suspended attorney can have no "direct contact with clients or prospective clients or witnesses or prospective witnesses when acting as a paralegal or law clerk or under the supervision of a member of the Bar, *or otherwise.*" *Id.* at 26.

The Panel reads that language to reflect the Supreme Court's care to make clear that a suspended attorney cannot meet with clients for the purpose of providing legal advice or in a legal setting in whatever capacity, whether acting as a paralegal or law clerk or under the supervision of a member of the Bar *or otherwise.* The Panel finds no support in the case law for the proposition that a suspended lawyer, for example, cannot meet with family members at family functions if the suspended lawyer had represented those family members prior to his suspension. He surely could not meet with them to provide legal advice but it cannot be that the Supreme Court intended that a suspended lawyer must be deprived of his contacts with friends and family simply because he once represented them prior to his suspension. Yet that is the effect of the ODC's proposed unduly expansive reading of that

language. Similarly, the Panel does not find that language to have precluded Davis from meeting on two occasions with Nicholson to discuss, among other things, general conditions in the real estate market. Accordingly, the Panel finds that the meetings with Nicholson did not violate the Suspension Order.

*Wolf*

On June 18, 2010, Wolf sold property owned by an LLC of which she was a member.[98] Before the settlement date, Wolf discussed the sale of this property with Davis, and from this discussion Wolf assumed that Redwood could represent her, as the seller, in the transaction.[99] Wolf testified that Davis did not tell her that but that it "was an assumption on my part."[100] Davis did quote Wolf a price of $320–$350.[101]

On June 16, 2010, two days before closing, Nixon, who handled the closing, emailed Wolf the following:

Just to follow up, can you recap what Michael Davis had promised to you in terms of this firm providing you services and representation, as well as the costs to you, when you had lunch with him last week?

Are you sure he said we could represent the buyer and the seller in the same transaction?[102]

At closing Wolf thought that Nixon represented her, when in fact he represented the purchasers.[103] Nixon had Wolf execute an Acknowledgement of Non–Representation clarifying that he only represented the buyer.[104]

Wolf testified that Davis neither provided legal advice nor held himself out as being permitted to practice law.[105] She also testified that she paid no legal fee to

---

**98.** Tr. 283: 22–24 & 284:1—285:2.

**99.** Tr. 285: 3–21.

**100.** Tr. 287: 16—288: 1.

**101.** Tr. 286: 13–16.

**102.** Ex. 12.

**103.** Tr. 289: 4–9; Tr. 293: 15–18; Tr. 219: 2—220: 3.

**104.** Ex. 13; Tr. 220:16–23.

**105.** Tr. 293:19—294: 2.

Davis.[106] However, she also testified that she believed based on her conversation with Davis that Redwood would be handling the matter of legal representation but that Davis could not participate because his license had been suspended.[107] Her uncontradicted testimony reflects that Davis caused her to believe that Redwood could handle the legal aspects of a closing even if Davis himself did not do the closing. This is a communication with a member of the public that an entity created by a suspended attorney could handle a closing. The Panel finds that in so communicating Davis violated the Suspension Order.

*Allegations Regarding Failure to Eliminate Public References to Davis Law LLC*

The Supreme Court in *Sanders* held that a suspended attorney must be careful to avoid communications with the public that suggest that he is a practicing attorney. Davis acknowledged that the Suspension Order so required by describing the care he took to remove signage, business cards, letterhead or emails containing "Davis Law." [108] Yet the ODC provided evidence that Davis sent on July 13, 2009 an email to Nixon with the email address mdavis@davislawworks. com. in response to an email from Nixon to the Redwood paralegals that similarly reflects that their email addresses ended in "davislawworks.com".[109] He also was copied on an email an email dated July 26, 2009 to two realtors from Donna Marshall, then a Redwood employee, whose email address was listed as "donna@davislawworks.com." to a member of the public that reflects the email address "davislawworks.com".[110] The Panel finds that the ODC proved by clear and convincing evidence that Davis knowingly violated the Suspension Order by failing to eliminate references to Davis Law in post-suspension communications, including in communications to members of the public by a Redwood employee.

## COUNT II: RESPONDENT PRACTICED LAW IN VIOLATION OF THE REGULATION OF THE LEGAL PROFESSION IN DELAWARE IN VIOLATION OF RULE 5.5(a)

Rule 5.5(a) requires that a lawyer "not practice law in a jurisdiction in violation of the legal profession in that jurisdiction." For the reasons stated in discussing Count I, the Panel finds that Respondent violated Rule 5.5(a) when he met with and provided legal advice to Mr. Gillespie.

## COUNT III: RESPONDENT ENGAGED IN PROFESSIONAL MISCONDUCT BY VIOLATING OR ATTEMPTING TO VIOLATE THE RULES OF PROFESSIONAL CONDUCT IN VIOLATION OF RULE 8.4(a).

Rule 8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct." For the reasons stated in our analysis of Count I, the Panel finds that the ODC proved by clear and convincing evidence that Respondent violated Rule 8.4(a).

## COUNT IV: RESPONDENT ENGAGED IN PROFESSIONAL MISCONDUCT BY ENGAGING IN CONDUCT THAT IS PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE.

Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in

---

106. Tr. 293:1–4.

107. Tr. 288:9–11.

108. Tr. at 437:17—438:4.

109. Ex. 4 at 102.

110. *Id.* at 103.

conduct that is prejudicial to the administration of justice." For the reasons stated in our analysis of Count I, the Panel finds that the ODC proved by clear and convincing evidence that Respondent violated Rule 8.4(d).

## COUNT V: RESPONDENT VIOLATED THE TERMS OF HIS PUBLIC DISCIPLINE IN VIOLATION OF RULE 7(c) OF THE DELAWARE LAWYERS' RULES OF DISCIPLINARY PROCEDURE.

Rule 7(c) of the Delaware Lawyers' Rules of Disciplinary Procedure provides that it shall be grounds for disciplinary action for a lawyer to "[v]iolate the terms of any [public] disciplinary [disposition]." For the reasons stated in the Panel's discussion of Count I, the Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated the terms of his public discipline.

## Analysis of Counts Related to November 5, 2008 Closing

## COUNT VI: RESPONDENT FAILED TO PROVIDE COMPETENT REPRESENTATION TO A CLIENT IN VIOLATION OF RULE 1.1:

The Panel finds that Petitioner failed to prove by clear and convincing evidence that Respondent violated Rule 1.1 in connection with the November 5, 2008 real estate settlement.

## COUNT VII: RESPONDENT FAILED TO ACT WITH REASONABLE DILIGENCE IN VIOLATION OF RULE 1.3:

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 1.3 in connection with the November 5, 2008 real estate settlement.

## COUNT VIII: RESPONDENT ENGAGED IN CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE IN VIOLATION OF RULE 8.4(d):

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(d) in connection with the November 5, 2008 real estate settlement.

Rule 1.1 requires that a "lawyer shall provide competent representation to a client." Rule 1.3 requires that a "lawyer shall act with reasonable diligence [in] representing a client." Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." The ODC contends that that Mr. Davis violated each of these rules when he conducted a real estate settlement for a client in his law office while under the influence of alcohol. Respondent admits that he was under the influence of alcohol when he conducted the real estate settlement but denies that he failed to provide competent representation. Answer, Paragraph 28. He also denies that he was not diligent in conducting the settlement and contends that the mere consumption of alcohol, without more, prior to providing legal services, is not a *per se* violation of Rule 1.1, Rule 1.3 or Rule 8.4(d).

Neither party submitted any Delaware authority on this point. The ODC relies in its opening brief upon one decision from Ohio, *Disciplinary Counsel v. Scurry*, 115 Ohio St.3d 201, 874 N.E.2d 521, 524 (2007). Although in that case the Ohio Supreme Court stated generally that an attorney who met with clients while drunk violated duties to provide competent representation to clients and to assist in the administration of justice (*Id.* at 524), the facts of that case were more egregious. For example, the attorney subject to discipline admitted that, as a result of his drunken condition,

his judgment was impaired while meeting with criminal defendant clients. *Id.* at 523. The defendants were so concerned about his being impaired on three occasions that they reported him to the court which appointed new counsel. *Id.* Neither the client nor the ODC contend here that Respondent's being under the influence of alcohol prevented him from completing the closing without error. And the client here used Respondent for legal work after this incident occurred, reflecting that this lapse did not affect her confidence in his capacity to represent her in other matters.[111] In its reply, Respondent also cited to *Oklahoma Bar Ass'n v. Giger,* 37 P.3d 856, 861 (Okla.2001). That case involved an attorney who attended a hearing and "exhibited slurred speech, and appeared to be under the influence of some unknown substance (*Id.*)," which the court found violated Rules 1.1 and 1.3. Unlike this matter, however, the attorney's drunken condition so adversely affected his client that the District Attorney agreed to a second preliminary hearing. It was not merely the attorney's having been under the influence but rather the attorney's misconduct in handling the client's defense that led to the conclusion that the attorney had violated Rules 1.1 and 1.3. *Id.*

This is not a case then of a client whose impairment due to alcohol prevented him from exercising appropriate judgment in the carrying out of legal tasks or duties. But nor is this a case of an attorney being under the influence entirely outside of the practice of law. Respondent admitted he was under the influence of alcohol during a real estate closing. And Respondent does not deny that he acted inappropriately in speech and action with one of the female participants at the end of the closing. Therefore, this is not simply a case of an

attorney under the influence of alcohol, without more.

After considering all the facts and circumstances, the Panel concludes that (i) the ODC has failed to prove by clear and convincing evidence of violation of Rule 1.1 but that (ii) the ODC has proved by clear and convincing evidence a violation of Rule 1.3 and Rule 8.4(d) because an attorney's "duty to act with reasonable diligence" requires that the attorney treat "all persons involved in the legal process with courtesy and respect." Rule 1.3, cmt 1. Mr. Davis's behavior was neither courteous nor respectful. In so finding, the Panel relies upon the vividness of Ms. Seramone's testimony that "I couldn't wait for that hour to be over. I can remember as though I am sitting here"[112] which for the Panel takes this case beyond an attorney acting boorishly and raises it to the level of a lack of the respect and courtesy which Rules 1.3 and 8.4(d) require.

### COUNTS IX and X Withdrawn from Record by ODC at Start of Hearing

### Analysis of Counts Related to September 8, 2008 Motor Vehicle Accident

### COUNT XI: RESPONDENT COMMITTED A CRIMINAL ACT IN VIOLATION OF RULE 8.4(b):

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(b) by reporting false information to a law enforcement officer relating to an actual offense or incident in violation of 11 *Del. C.* § 1245.

Rule 8.4(b) provides that a lawyer engages in professional misconduct if he were to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." The ODC argues that

---

111. Tr. 372:21–24.

112. Tr. 369:5–8.

"Not only did Mr. Davis drive while under the influence of alcohol, he also had a cup of alcohol in the car at the time of the accident, *supra* at 22, both of which are criminal acts. *See* 21 *Del. C.* §§ 4177 & 4177J." [113] This argument fails for lack of a valid premise. First, the police did not charge Mr. Davis with violations of either of these statutes. Second, Section 4177(j) appears to require that an offender ingest alcohol while in the act of operating a motor vehicle in the presence of, or in the view of, a police officer. The facts do not support such a violation here.

The evidence also fails to support the ODC's charge that Respondent fled the scene to go home and drink so as to prevent an investigation of his behavior. Again, the police did not charge Respondent with fleeing the scene of an accident even though they knew that Respondent consumed alcohol *after* he arrived at his home. He was charged with failure to report an accident with property damage in excess of $500 and driving at an unsafe speed. Moreover, there is no evidence that when Respondent left the accident scene to go home, he intended to drink so as obstruct a police investigation. Even accepting the testimony of Mr. Logan as discussed more fully below, Davis's alleged idea to drink to prevent the police from

doing a sobriety test occurred only after he was already at home.

What the Panel finds more troubling is the ODC's contention that Respondent reported false information to a law enforcement officer "relating to an actual offense or incident" in violation of 11 *Del. C.* § 1245. Specifically, the ODC contends that Respondent now admits that he consumed alcohol prior to the accident [114] but the investigating officer testified that Davis denied doing so. [115] Davis contends that he was not asked this question and denies giving this answer. [116] The Panel notes that the investigating officer's report does not include any reference to Respondent having denied or the investigating officer having asked whether the Respondent consumed alcohol prior to the accident. For the following reasons we find the officer's testimony clear and convincing that he asked and Davis denied drinking prior to the accident: 1) the officer's report indicates that he suspected alcohol was involved in the accident, [117] 2) the report noted that there was liquid on the dash and a slight odor of an alcoholic beverage from inside the vehicle, [118] and 3) there was a plastic cup outside the vehicle on the ground. [119] The Panel therefore concludes that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(b) by reporting false in-

113. ODC Opening Brief at 39.

114. Ex. 2 at ¶ 38

115. Tr. 388:5–13.

116. Tr. 557:11–15.

117. Ex. 21 at 174.

118. *Id.* at 175.

119. *Id.* The Panel finds that the ODC did not prove by clear and convincing evidence that Respondent falsely denied that the cup found outside the car with residue of wine was his.

The reason for this is the investigating officer's testimony that it was possible he asked Davis whether he would try and tell the officer the cup was not his and that if Davis said no, he would interpret that to mean he was being deceptive. This suggests either the officer was confused by the double negative or that he misinterpreted Davis's response. Either way, the officer's testimony precludes the Panel from finding that the ODC met its burden of proving by clear and convincing evidence that Davis falsely denied that the cup found outside the motor vehicle was his.

formation to a law enforcement officer relating to an actual offense or incident in violation of 11 *Del. C.* § 1245.

## COUNT XII: RESPONDENT ENGAGED IN CONDUCT INVOLVING DISHONESTY, DECEIT AND MISREPRESENTATION IN VIOLATION OF RULE 8.4(c):

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(c) by ingesting alcohol following a motor vehicle accident with the intent to prevent the police from performing an alcohol test to determine whether Respondent had been driving under the influence.

Rule 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." For the reasons set forth in our discussion of Count XIV and in reliance upon *In re Melvin,* 807 A.2d 550, 552–553 (Del.2002) (Respondent violates Rule 8.4(c) by concealing or destroying evidence which may have led to a criminal charge), the Panel finds that petitioner has proved by clear and convincing evidence that Respondent violated Rule 8.4(c).

## COUNT XIII: RESPONDENT ENGAGED IN CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE IN VIOLATION OF RULE 8.4(d):

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.4(d) by ingesting alcohol following a motor vehicle accident with the intent to prevent the police from performing an alcohol test to determine whether Respondent had been driving under the influence.

Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." For the reasons set forth in our discussion of Count XIV and in reliance upon *In re Melvin,* 807 A.2d 550, 552–553 (Del.2002) (Respondent violates Rule 8.4(d) by concealing or destroying evidence which may have led to a criminal charge), the Panel finds that petitioner has proved by clear and convincing evidence that Respondent violated Rule 8.4(d).

## COUNT XIV: RESPONDENT KNOWINGLY MADE A FALSE STATEMENT OF MATERIAL FACT IN VIOLATION OF RULE 8.1(a):

The Panel finds that Petitioner proved by clear and convincing evidence that Respondent violated Rule 8.1(a) in his narrative describing his conduct in the September 18, 2008 motor vehicle accident.

Rule 8.1(a) provides that a lawyer in connection with a disciplinary matter shall not "knowingly make a false statement of material fact." "Knowingly" denotes "actual knowledge of the fact in question. A person's knowledge may be inferred from the circumstances." Rules, 1.0(f).

In connection with his potential Reinstatement, Respondent submitted a Reinstatement Questionnaire.[120] The Reinstatement Questionnaire asked whether since Respondent's admission to the Bar, he had ever been cited, charged, warned, arrested or prosecuted for any crime or rules violation, including any motor vehicle accident or moving violation. Since Respondent checked "Yes", he was asked to provide additional information for each offense, including a. Nature of warning or charges against you and citation to criminal custody; b. Names and addresses of complaining witnesses, c. A certified copy of the citation, warning or indictment and

**120.** Ex. 3.

disposition or judgment, d. Name, court and address of trial judge (if not contained in information supplied in response to "c", and e). Name, organization and address of law enforcement agency or authority and prosecutor (if not contained in "c" above). For the September 18, 2008 motor vehicle accident Respondent submitted a narrative which included the following statements:

- "At the time of the accident I did not have my cell phone with me, so I walked home."
- "Originally, I was charged with Unsafe Speed and Failure to Report the Accident, however, upon an explanation of the fact that I did not have a means of communication (i.e. cell phone) with me at the time of the accident and a full explanation of the accident, the charge was reduced to inattentive driving."
- "Upon arriving home, I was greeted by the New Castle County Police."
- "I provided full cooperation with their [the police] investigation of the crash."
- "I provided full cooperation to the officers."

Respondent also reported under section a. that he was charged with "inattentive driving" in violation of 11 *Del. C.* 4176(b).

The ODC contends that the first statement—"At the time of the accident I did not have my cell phone with me, so I walked home"—was false in that the police report indicates that Respondent informed the investigating officer that he was distracted by talking on the cell phone. The Panel finds no reason to doubt the contemporaneous writing of the investigating officer in the police report that Davis "advised he was driving too fast and was on the cell phone. As a result he lost control of vehicle."[121] Therefore, the Panel finds that

ODC has met its burden of proving by clear and convincing evidence that Davis's statement to the contrary in the Reinstatement questionnaire was false.

The ODC also contends that Respondent obstructed the investigation of his motor vehicle accident by intentionally consuming alcohol while he waited for the police to arrive, not to calm his nerves as Respondent contends, but rather to prevent the investigating officers from doing an alcohol test. Therefore, the ODC contends that the statement that upon arriving home he was greeted by the police is knowingly false because he knew when he made the statement that the police arrived after he had returned to his home. Also the ODC contends that the statements that he fully cooperated with the police and with the crash investigation are also false because he deliberately drank alcohol to prevent the police from conducting an alcohol test.

Respondent acknowledges that his statement concerning being greeted by the police upon his return home was not completely accurate. He concedes that a completely accurate statement would have been to say "shortly after arriving home, I was greeted by the police."[122] The question then is whether this inaccurate statement was knowing and material. In part the answer to this question depends upon whether the ODC proved by clear and convincing evidence that Respondent improperly frustrated a police investigation by drinking alcohol after the accident and before the police arrived. The evidence for this claim is the testimony of Dan Logan and Donna Marshall. Logan testified that the day after the accident, Respondent called him to say that the lawyer in him came out and he popped open a couple of bottles of wine while waiting for

---

**121.** Ex. 21 at 175.

**122.** Tr. 101:21–102:3.

the police to arrive so that the police would not be able to conclude that he had consumed too much alcohol before the accident.[123] Donna Marshall testified similarly, adding that he told her he had gotten out of trouble for DUI by drinking before the police arrived at his home and that the police told him that that was a smart strategy.[124]

The Panel is mindful that each of these witnesses has grudges against Respondent, Logan because Davis broke a promise to hire his daughter-in-law at Redwood and Marshall because she felt that Davis was responsible for her losing her claim for unemployment benefits when she left Redwood. But the Panel, having carefully observed the demeanor of each witness, finds them to be credible on this point, in part because each independently corroborated similar statements from Davis and each had a trusting relationship with Davis at the time the statements were made. So the question is whether an attorney who consumes alcohol after he has earlier ingested alcohol and then had a motor vehicle accident intending to preclude the police from administering an alcohol test knowingly obstructs a police investigation. If so, the timing of when the police arrived at his home becomes material as does the accuracy of the statement that Respondent cooperated with the police investigation.

As a preliminary matter, the Panel notes that Respondent did cooperate with police in the sense of responding to questions at home and at the scene of the accident. There is no contention that Davis was hostile or threatening or unwilling to answer questions. The Panel also observes that Respondent was open with the police that he had consumed alcohol while he was at home and after the accident. In that sense he cooperated fully with the officers. But Davis also certified in the Reinstatement Questionnaire that he cooperated fully *with the investigation.* However, the investigating officer testified that he was unable to administer an alcohol test based on Respondent's stating that he had been drinking after the accident when he returned home.[125] Based on the testimony of Logan and Marshall, the Panel concludes that the statements in Respondent's narrative on the Reinstatement Questionnaire that "Upon arriving home, I was greeted by the New Castle County Police." and "I provided full cooperation with their [the police] investigation of the crash." were "knowingly false statements of material fact" in violation of Rule 8.1(a).

## COUNT XV: RESPONDENT FAILED TO DISCLOSE A FACT NECESSARY TO CORRECT A MISAPPREHENSION KNOWN TO HAVE ARISEN IN VIOLATION OF RULE 8.1(b)

Rule 8.1(b) provides that a lawyer in connection with a disciplinary matter shall not "fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter." The ODC does not allege a "misapprehension known to have arisen." Instead, in its proposed conclusion of law for this count, it reasserts that Respondent knowingly made false statements of material fact, allegations which the Panel found that it proved.[126] At the time Respondent completed his Reinstatement Questionnaire, however, which is the factual predicate for this count, there was no misapprehension known to have arisen in a disciplinary proceeding. The Panel therefore finds

123. Tr. 410:4—411:16.

124. Tr. 160:3—14.

125. Tr. 381:6–14; 382:13–20.

126. *See* ODC Opening Brief at 62.

that this Rule does not apply to the facts alleged by the ODC.

**Analysis of Counts Related to the July 19, 2009 Lums Pond Incident**

**COUNT XVI: RESPONDENT ENGAGED IN A CRIMINAL ACT IN VIOLATION OF RULE 8.4(b):**

The Panel finds that Petitioner has proven by clear and convincing evidence a third alcohol-related offense in ten months that resulted in one ethical and two criminal violations. While none of these individually would suffice to constitute a violation of Rule 8.4(b), the Panel finds that Respondent's use of alcohol resulted in conduct that reflects indifference to legal obligation in a concentrated time period.

**COUNT XVII: RESPONDENT ENGAGED IN CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE IN VIOLATION OF RULE 8.4(d):**

The Panel finds that Petitioner has not proved by clear and convincing evidence that Respondent violated Rule 8.4(d) in connection with the July 19, 2009 Lums Ponds incident.

**COUNT XVIII: RESPONDENT FAILED TO DISCLOSE A FACT NECESSARY TO CORRECT A MISAPPREHENSION KNOWN TO HAVE ARISEN IN VIOLATION OF RULE 8.1(b):**

The Panel finds that Petitioner failed to prove by clear and convincing evidence a violation of Rule 8.1(b) in connection with the Lums Pond incident.

The evidence shows that Respondent pled guilty to public intoxication and indecent exposure and attached to his Reinstatement Questionnaire the citation he received which describes his misconduct as a "Conduct Violation" and an "Alcohol Violation". The ODC argues that because Respondent pled guilty to public intoxication and indecent exposure, he has *a fortiori* violated Rules 8.4(b) and 8.4(d). Rule 8.4(b) provides that a lawyer engages in professional misconduct if he were to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." As to the latter, the Panel finds that the ODC did not prove with clear and convincing evidence that Respondent violated Rule 8.4(d) because he was intoxicated on public property and inadvertently exposed himself while changing from his bathing suit in a parking lot. This event does not reflect well on Respondent's judgment but the behavior is not the type of moral turpitude for which Respondent should be professionally answerable. The absence of legal authority supporting a violation of Rule 8.4(d) coupled with one respected commentator's admonition that "subsection (d) raises the specter of a disciplinary authority creating new offenses by common law" informs the Panel's judgment not to find a violation of Rule 8.4(d) on the facts presented. *See* G. Hazard and W. Hodes, *The Law of Lawyering*, Section 65.6 at 65–15 (2009 Supplement).

Similarly, the Panel concludes that the ODC has failed to prove by clear and convincing evidence that Respondent has violated Rule 8.1(b) in his narrative and other disclosures in the Reinstatement Questionnaire. The Panel does not find it material that Respondent stated that he was with his "family" when he was with his son alone and not his entire family. Nor does the Panel find materially misleading Respondent's statement that someone inadvertently viewed him while he was disrobing and complained to a DNREC officer. The evidence reflects that one person

from the family who complained contacted the park officer. And the citation that Respondent submitted with his Questionnaire reflects that two adults and one juvenile had viewed him while he was disrobed. Finally, while in his narrative Respondent did not state that he had pled guilty to public intoxication and lewdness, the citation he attached to his Reinstatement Questionnaire reflected that he pled guilty to those charges. As noted above, the citation reflects that the DNREC officer charged him with what the DNREC officer titled as a "Conduct" and an "Alcohol" violation. Therefore, the Panel concludes that Petitioner has failed to prove by clear and convincing evidence a violation of Rule 8.1(b) in connection with Respondent's account of the Lums Pond incident.

Were this not the third incident involving alcohol in ten months, two of which resulted in criminal charges and one of which we have found to have resulted in a violation of Rule 1.3, the Panel would also find that the ODC had not proved a violation of Rule 8.4(b). However, the commentary to Rule 8.4 states that "A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation." In this case, the Panel observes three instances of alcohol-related violations which have led to ethical and criminal violations within a ten-month period. This pattern of alcohol-related violations in a short time leads the Panel to find that this incident, when added to the violations noted above, suffice to reflect adversely on the Respondent's fitness as a lawyer in violation of Rule 8.4(b).

## CONCLUSION

Based on the above findings of violations of Rules 1.3, 3.4(c), 5.5(a), 8.1(a), 8.4(a), 8.4(b), 8.4(c), 8.4(d), and Rule 7(c) of the Delaware Lawyers' Rules of Disciplinary Procedure, the Panel will schedule a sanctions hearing at the earliest convenience of the parties and the Panel.

By: /s/ Lewis H. Lazarus
 Lewis H. Lazarus, Esq.
 Panel Chair

By: /s/ Robert K. Beste, Jr.
 Robert K. Beste, Jr., Esq.

By: /s/ John Stafford
 Mr. John Stafford

Dated: October 7, 2011

### APPENDIX II

**BOARD ON PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF THE STATE OF DELAWARE**

In the Matter of a Member of the Bar of the Supreme Court of Delaware:

**MICHAEL R. DAVIS,** Respondent.

ODC File No. 2010-0404-B,

### *SANCTIONS RECOMMENDATION*

Following issuance of a report dated October 7, 2011, in which the Panel proposed findings of fact and conclusions of law and recommended that the Supreme Court find that Respondent violated Rules 1.3, 3.4(c), 5.5(a), 8.1(a), 8.4(a), 8.4(b), 8.4(c), and 8.4(d) of The Delaware Lawyers Rules of Professional Conduct, and Rule 7(c) of the Delaware Lawyers' Rules of Disciplinary Procedure ("October 7, 2011 Report"), the Panel conducted a sanctions hearing on November 15, 2011 ("Sanctions Hearing"). At the Sanctions Hearing the Office of Disciplinary Counsel ("ODC") offered no witnesses. Respondent testified on his own behalf and also proffered the testimony of one character witness, Thomas Conaty, Esq., and Carol Waldhauser of the Lawyers Assistance Program. Thereafter, on December 16, 2011, counsel for the parties submitted briefs reflecting their conflicting positions on the appropriate

sanctions. This is the Panel's sanctions recommendation. For the reasons stated below, the Panel recommends that Respondent be disbarred.

## I. The Applicable Standard

The Delaware Supreme Court has set forth the goals of the disciplinary system and the applicable standard:

> The objectives of the lawyer disciplinary system are to protect the public, to protect the administration of justice, to preserve confidence in the legal profession, and to deter other lawyers from similar misconduct. To further these objectives and to promote consistency and predictability in the imposition of disciplinary sanctions, the Court looks to the ABA Standards for Imposing Lawyer Sanctions as a model for determining the appropriate discipline warranted under the circumstances of each case. The ABA framework consists of four key factors to be considered by the Court: (a) the ethical duty violated; (b) the lawyer's mental state; (c) the extent of the actual or potential injury caused by the lawyer's misconduct; and (d) aggravating and mitigating factors.

*In Re Bailey,* 821 A.2d 851, 866 (Del.2003). The Delaware Supreme Court also has emphasized that the purpose of the rules is not to punish lawyers. *In Re Reardon,* 759 A.2d 568, 575 (Del.2000), citing *In Re Benge,* 754 A.2d 871, 879 (Del.2000).

## II. Application of the Standard

### A. *Ethical Duties Violated*

The Panel recommended that the Supreme Court find that:

1. Respondent knowingly violated Rule 3.4(c) of the Delaware Lawyers Rules of Professional Conduct by knowingly disobeying a Suspension Order by (a) meeting with a former client to provide legal advice; (b) discussing legal services and fees with a potential client which led her to believe that his residential services company could provide legal services; and (c) using his former law firm email address in communications with the public at least six weeks after the suspension order; and that the aforementioned misconduct also violated Rules 8.4(a) (violate or attempt to violate the Rules) and 8.4(d) (conduct prejudicial to the administration of justice) and Rule 7 of the Delaware Lawyers' Rules of Disciplinary Procedure ("Procedural Rules") (disciplinary action appropriate for violation of the Procedural Rules);

2. Respondent knowingly violated Rule 5.5(a) by practicing law in violation of the legal profession in that jurisdiction when he met with a former client to provide legal advice;

3. Respondent violated Rules 1.3 and 8.4(d) by failing to act with reasonable diligence and engaging in conduct prejudicial to the administration of justice when he conducted a real estate settlement on November 5, 2008 while under the influence of alcohol;

4. Respondent violated Rules 8.4(b) in reporting false information to a law enforcement officer regarding whether he consumed alcohol before a September 18, 2008 auto accident;

5. Respondent violated Rule 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation and violated Rule 8.4(d) by engaging in conduct prejudicial to the administration of justice when he consumed alcohol with the intent to prevent the police from performing an alcohol test to ascertain whether he was driving under the influence of alcohol at the time of the auto accident;

6. Respondent knowingly made a false statement of material fact in violation of Rule 8.1(a) when he misstated

the circumstances of the September 18, 2008 accident and his cooperation with the police investigation; and

7. Respondent's alcohol-related violation on July 19, 2009 reflected an indifference to legal obligation in violation of Rule 8.4(b) when considered in light of his two alcohol-related violations within the prior 15 months.

The Panel's recommended findings reflect violations of duties owed to clients, the public, the legal system and the profession. Respondent violated his duties to clients, the legal system and profession when he handled a settlement while under the influence of alcohol and when he met with Mr. Gillespie for the purpose of rendering legal advice while suspended. He violated duties owed the public, legal system and the legal profession when he did not honestly respond to a police officer's question regarding his drinking prior to an accident, when he misstated on his Reinstatement Questionnaire the circumstances of the accident and his cooperation with police, when he acted deliberately to prevent the police from performing a sobriety test,[127] and when he committed another legal violation while under the influence of alcohol in a public park. These are all acts of misconduct that reflect a failure to maintain standards of personal integrity upon which the community relies. Finally, he violated duties owed the public, the legal system and the profession when he mistakenly advised a potential client of Redwood's capacity to provide legal services and failed to eliminate email references to his former firm in communications by his office with the public six weeks after he was suspended in violation of the Suspension Order.

2. The Lawyer's Mental State

The ODC proved by clear and convincing evidence that Respondent acted knowingly in (a) meeting with a former client to provide legal advice; (b) discussing legal services and fees with a potential client which led her to believe that his residential services company could provide legal services; (c) using his former law firm email address in communications with the public at least six weeks after the suspension order; (d) in making a false statement to a law enforcement officer regarding whether he consumed alcohol before the September 18, 2008 auto accident and (e) in making a false statement of material fact when he misstated the circumstances of the September 18, 2008 accident and his cooperation with the police investigation. It proved he acted intentionally in consuming alcohol to prevent the police from performing an alcohol test to ascertain whether he was driving under the influence of alcohol at the time of the September 18, 2008 auto accident. His state of mind regarding the performance of the real estate settlement while under the influence and the conduct at Lums Pond reflects negligence.

3. The extent of the actual or potential injury

The ODC did not prove that the conduct of Respondent resulted in any actual harm to any client. Indeed, with the exception of meeting with Mr. Gillespie to provide legal services, and his performance of a real estate settlement while under the influence, his misconduct did not directly involve any clients. As to the former, he arranged for another attorney to actually handle the litigation proceeding at issue and the record reflects that the real estate

127. The Panel notes that it is an unusual case when the ODC will be able to prove by clear and convincing evidence that an attorney consumed alcohol with the intention to preclude police from conducting a sobriety test. Here, that is what Respondent admitted to two trusted friends and colleagues contemporaneously with the incident.

settlement was completed without error. Therefore, the record reflects no actual injury to any clients. Nonetheless, there was potential for actual injury due to his conduct of a settlement while under the influence of alcohol.

The harm to the public, the legal system and the profession is more serious. The misstatements to law enforcement and intentional conduct to frustrate a police investigation, and attempt to deceive the ODC, the Board and the Supreme Court in his Reinstatement Questionnaire reflect a failure to maintain standards of personal integrity upon which the community relies. As the Supreme Court has recognized, one of an attorney's fundamental duties is "to abide by the law and to maintain the standards of personal integrity and honesty upon which the community relies." *In re Howard*, 765 A.2d 39, 44–45 (Del.2000).

#### 4. Appropriate Sanction

"Severe sanctions should be imposed on lawyers who violate the terms of prior disciplinary orders." ABA Standards for Imposing Lawyer Sanctions ("ABA Standards") 8.0. Standard 8.1 provides that

Disbarment is generally appropriate when a lawyer:

a. intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession; or

b. has been suspended for the same or similar misconduct, and intentionally or knowingly engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.

Respondent contends that Standard 8.0 is inapplicable because absent mitigating circumstances, suspension is generally appropriate where a lawyer has been reprimanded for the same or similar misconduct and engages in further similar acts of misconduct that cause injury or potential injury to a client, the public, the legal system or the profession. (ABA Standard 8.2) Respondent contends that the Panel made no finding that Respondent was reprimanded for the same or similar misconduct and then engaged in the same or similar conduct thereafter. He argues that the terms and conditions of the Suspension Order were not directly related to the misconduct that led to the suspension.

That argument depends on how one views "similar acts of misconduct". The prior suspension was for false notarizations and misrepresentation for personal gain. The Supreme Court found the Respondent's conduct to be "undeniably "knowing" and was deceptive, if not criminal." *In re Michael R. Davis*, No. 301, 2008 at 9 (Del.2009) (*Per Curiam*). The Panel's October 7 Report recommends that the Supreme Court find that Respondent misrepresented that he had not been drinking in response to a question from the officer investigating his auto accident, acted intentionally to frustrate the investigation by preventing a sobriety test, and then misrepresented the facts and circumstances attendant to that incident in his Reinstatement Questionnaire. While the current recommended finding of misconduct did not involve a real estate transfer, it did involve additional acts of misrepresentation to public officials and institutions. In view of the auto accident having occurred prior to the initial suspension, the Panel notes that it is only the misrepresentation in the Reinstatement Questionnaire that constitutes a further act of similar misconduct. At the same time, the record reflects a continuing pattern of misrepresentation for a personal benefit. For that reason the Panel believes that in misrepre-

senting the circumstances of his September 18, 2008 auto accident in connection with his Reinstatement Questionnaire, the Respondent knowingly engaged in a further act of misconduct that caused injury or potential injury to the profession. Moreover, the Panel also recommended in its October 7, 2011 Report that the Supreme Court find that Respondent knowingly violated the terms of his Suspension Order by on one occasion meeting with a client to provide legal services, by failing to take appropriate steps to extinguish email references to his former firm in communications with the public at least six weeks after the issuance of the Suspension Order and by misrepresenting to a potential client that his new real estate services firm could provide legal services in connection with a real estate transaction. This constitutes a knowing violation of the terms of a prior disciplinary order which created the risk of potential injury to a client, and injury to the public, and the profession.

Section 5.1 is also relevant. That provides as follows:

5.1 Failure to Maintain Personal Integrity

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:

5.11 Disbarment is generally appropriate when:

a. a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation or theft, or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt conspiracy or solicitation of another to commit any of these offenses; or

b. a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously and adversely reflects on the lawyer's fitness to practice.

5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

Respondent argues that because the misconduct occurred outside Mr. Davis's practice of law and in fact occurred during his suspension,[128] such conduct does not meet the standard of seriously and adversely reflecting on his fitness to practice law. The Panel cannot agree. Section 5.11(b) provides that disbarment generally is appropriate when a lawyer engages in "intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously and adversely reflects on the lawyer's fitness to practice." The Panel's findings reflect intentional conduct involving dishonesty, misrepresentation and deceit in connection with a criminal investiga-

128. In fact the September 18, 2008 accident pre-dated his suspension. It is only the false account of the circumstances of that incident and the investigation that occurred during his suspension.

tion and his potential reinstatement to the Bar.

Respondent also argues that Section 5.13 provides the more apt sanction. That section provides that a reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit or misrepresentation and that adversely reflects on the lawyer's fitness to practice law. However, the Commentary to the ABA Standards for Section 5.13 notes that "There are few situations not involving fraud or dishonesty which are sufficiently related to the practice of law to subject a lawyer to discipline." As noted, the Panel's recommended findings do involve dishonesty. And because the Panel's findings reflect a pattern of repeated offenses regarding dishonesty—the conduct underlying the original suspension, the false statement to a police officer in a criminal investigation, and the dishonesty in the Reinstatement Questionnaire, the Panel finds inapplicable Section 5.13 and its commentary.

Accordingly, before considering the aggravating and mitigating factors, the Panel recommends that the violation of a prior suspension order grounded in misrepresentation and deceit by engaging in at least one further act of misrepresentation and deceit, the proof of other previously unknown acts of misrepresentation and deceit in connection with the September 18, 2008 auto accident, and the knowing violation of the Suspension Order by meeting on one occasion with a client to provide legal advice cumulatively warrant the most serious sanction of disbarment. The additional ethical violation in connection with the real estate settlement prior to the suspension and two criminal acts cumulatively reflect an indifference to legal obligation which further supports the sanction. The Panel thus concludes that the appropriate sanction here is disbarment, subject to the aggravating and mitigating factors.

*Aggravating and Mitigating Factors*

Section 9.21 of the ABA Standards defines aggravating factors as "any considerations, or factors that may justify an increase in the degree of discipline to be imposed." Section 9.22 lists the following factors which may be considered in aggravation:

(a) prior discipline offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with the rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

The parties agree that the aggravating factors include (a) prior disciplinary offenses; (c) pattern of misconduct; (d) multiple offenses; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; and (i) substantial experience in the practice of law. The ODC contends that additional aggravating factors are a pattern of misconduct, bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary process, and refusal to acknowledge the wrongful nature of his conduct. The Panel agrees that Respondent's misconduct does reflect a pattern of dishonesty and misrepresentation and thus that is an additional aggravating factor.

The Panel does not agree that the ODC proved a bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary process or that Respondent failed to acknowledge the wrongful nature of his conduct. The Panel believes that at the Sanctions Hearing the Respondent did acknowledge the wrongful nature of his conduct.

Mitigation or mitigating circumstances are any considerations or factors that justify a reduction in the degree of discipline to be imposed. Section 9.32 of the ABA Standards lists the following factors which may be considered in mitigation:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical or mental disability or impairment;

(i) delay in disciplinary proceedings;

(j) interim rehabilitation;

(k) imposition of other penalties or sanctions;

(l) remorse;

(m) remoteness of prior offenses.

Respondent argues that the Panel should consider as mitigating factors: (c) personal and emotional problems to which he testified at the Sanctions Hearing; (g) character and reputation based on the testimony of Thomas Conaty, Esq.; (h) physical or mental disability or impairment as supported by the testimony of Carol Waldhauser at the Sanctions Hearing; (j) interim rehabilitation as supported by the testimony of Carol Waldhauser; and (l) remorse as expressed by Respondent at the Sanctions Hearing. The ODC contends that the mitigating factors have no application or should be given little weight and that in any event the aggravating factors outweigh the mitigating factors.

As a preliminary point, the Panel does not consider physical or mental disability or impairment based on Ms. Waldhauser's testimony to be a mitigating factor because she had no contact with Respondent during the time of the violations. Further, she testified at the Sanctions Hearing that she offered no opinion as to whether Respondent's depression or alcohol abuse was a causal factor in any of the conduct as to which the Panel recommends the Supreme Court find constitutes ethical violations. A recent amendment to the commentary on mitigation in the ABA Standards provides that "direct causation between the disability or chemical dependency and the offense must be established." As Respondent asks that we consider this factor based solely on the testimony of Carol Waldhauser, her testimony that she had no opinion as to whether Respondent's depression or alcoholism were causally related to the misconduct, precludes us from considering this factor in mitigation. The Panel does consider as mitigating factors the personal and emotional problems as to which Respondent testified, in particular, his emotional reaction to his father's illness and death and his reputation as a reliable and capable real estate attorney as to which Mr. Conaty testified. This latter testimony only marginally mitigates the dishonesty which is at the core of the misconduct at issue. Finally, the Panel does consider as mitigating factors the remorse expressed by Respondent at the Sanctions Hearing (Sanctions Hearing Transcript at 26–28)

and the attempts at rehabilitation with Carol Waldhauser.

In the aggregate the Panel finds that the aggravating factors outweigh the mitigating factors and therefore those factors do not cause the Panel to modify its sanctions recommendation of disbarment.

*Discussion of Case Law*

The most apt case law is that addressing attorneys who knowingly violate a suspension order (*In re Tonwe*, 929 A.2d 774 (Del.2007)); whose misconduct involves a pattern of dishonesty (*In re Clyne*, 581 A.2d 1118 (Del.1990)); and whose violations are numerous such that they reflect indifference to legal obligation. In *Tonwe*, the Delaware Supreme Court recognized that the " 'most common case' " for disbarment is " 'one where a lawyer has been suspended but, nevertheless, practices law' " and that " 'when the record establishes a lawyer's willingness to violate the terms of his suspension order, disbarment is appropriate as a prophylactic measure to prevent further misconduct.' " *Id.* at 780, quoting ABA Standard 8.0, Commentary (internal citation and quotations omitted). In *Clyne* the Supreme Court accepted the Board's finding that the respondent's alcoholism did not excuse his conduct because of the "involved pattern of the Respondent's misrepresentations, their persistence and the Respondent's resourcefulness in that regard." *Id.* at 1123. Clyne's misrepresentations included misrepresentation to a court and the submission of false documents to support those false statements which did not occur here. But Respondent here was suspended for false notarizations in real estate transactions for his own financial gain and then while suspended made misrepresentations as to the facts and circumstances of an automobile accident in his Reinstatement Questionnaire to mask a crime of lying to a police officer and the equivalent of the destruction of evidence by drinking with the intent of avoiding a sobriety test. As in *Clyne* this conduct reflects an "abandonment of the fundamental concept of candor that is essential to the continued practice of law." *Id.* at 1126. *See also Matter of Melvin*, 807 A.2d 550, 555 (Del.2002) (knowing violation of a court order and deliberate document destruction are "flagrant violations of [an attorney's] professional duties to the legal system and reflect a lack of respect for his position as an officer of the Court.") While the Court in *Melvin* suspended the attorney for 18 months, the attorney there had no disciplinary record, did not violate a prior suspension order, did not have multiple violations and did not present a pattern of deceitful and dishonest conduct.

In making its recommendations for the ultimate sanction of disbarment, the Panel has attempted to follow the specific directives of this Court in *Tonwe*, *Clyne* and *Melvin*. Nonetheless, the Panel acknowledges that the specific facts of this case are not squarely addressed by the factual circumstances of those cases.

For example, in *Clyne*, the Court confronted multiple and substantial material misrepresentations in open court to the Supreme Court, and material misrepresentations regarding case actions which could be characterized as nothing less than bold-faced lying to the Court. Additional violations involved neglect of client matters, as well as failure to cooperate with the Office of Disciplinary Counsel. In *Tonwe*, a Pennsylvania attorney (not licensed in Delaware) opened a practice in Delaware out of her home. When confronted by the ODC, a Cease–and–Desist Order was entered into prohibiting the attorney from practicing in Delaware. Thereafter, in 1991, the attorney was convicted of bribing a Federal Immigration official and served 37

months in prison. As a result, the attorney was disbarred in Pennsylvania, as well as in Ohio and the District of Columbia, where she also was barred. Although the attorney was reinstated in Pennsylvania in 2002, between 2003 and 2006 the attorney represented in excess of 100 Delaware residents in Delaware matters in clear violation of the Cease–and–Desist Order, clearly a gross series of intentional violations, for someone not admitted to practice in Delaware in the first place.

The *Melvin* decision involved an 18–month retroactive suspension involving charges of felonies and misdemeanors and an ultimate plea to two misdemeanors, for contempt of a Protection from Abuse Order, and hindering prosecution by concealing or destroying evidence, in this instance, his wife's journals.

*In Re Benge,* 783 A.2d 1279 (Del.2001), cited by ODC, involves an attorney who was disbarred based on the respondent's having neglected numerous cases, improper conduct, failure to follow Court Rules, acting in conflict of the interest of his client—all on top of a prior private admonition and probation, additional disciplinary proceedings while on probation, resulting in a public reprimand and two years of probation, and also a one year suspension for numerous additional and similar violations.

*In Re Kingsley,* 950 A.2d 659 (Del.2008), involves a Pennsylvania attorney practicing in Delaware, and improperly holding himself out as a Delaware attorney, systemic and continuing legal presence in Delaware, and the violation of a prior Cease–and–Desist Order.

The Panel considered the Respondent's arguments that the violations found here are not of the same nature and extent of the conduct described in the disbarment cases referenced above. The Panel believes that Respondent made significant efforts to avoid the practice of law, but made a misstep with respect to the Gillespie meeting, the e-mail with an attorney reference, and the misstatement to a potential client that his new company could provide legal services. The November 8, 2008 settlement showed poor judgment but not a knowing and intentional consumption of alcohol with the knowledge that a settlement was upcoming. The 2008 auto accident, and Lums Pond incident did not affect directly the practice of law, but certainly reflected poor judgment and an alcohol problem that would not normally constitute actions resulting in disbarment. On the other hand, none of the prior case law involved an attorney suspended for misrepresentations for personal gain who then, while suspended, violated the suspension order and also intentionally misstated the facts and circumstances of a criminal violation arising from an auto accident while applying for reinstatement.

In essence, it is clear that Respondent needs help and deserves significant sanctions. The Panel understands, however, that the Supreme Court, consistent with the ABA Standards, "takes very seriously a lawyer's fundamental duty to foster public confidence in our Bar and to maintain the integrity of the legal profession. A lawyer must abide by the law and maintain the standards of personal integrity and honesty upon which the public relies and which reflect on every member of the legal profession." *Howard,* 765 A.2d at 46. Respondent before and during suspension violated those standards in what even Respondent concedes was a pattern of misconduct. Accordingly, while the facts underlying prior disbarment decisions involved conduct more directly related to the practice of law, and sometimes more egregious circumstances, the Panel concludes that a sanction of disbarment is supported by the relevant case law.

For the reasons stated, the Panel recommends that the Supreme Court disbar Respondent and order that he pay the costs of this proceeding.

By: /s/ Lewis H. Lazarus
 Lewis H. Lazarus
 Panel Chair

By: /s/ Robert K. Beste, Jr.
 Robert K. Beste, Jr., Esq.

By: /s/ John Stafford
 Mr. John Stafford